THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALFRED BEAMON *et al.*, Defendants-Appellants.

First District (6th Division)   Nos. 1—88—0995, 1—88—2669 cons.

Opinion filed April 26, 1991.

Randolph N. Stone, Public Defender, of Chicago (Timothy J. Leeming, Assistant Public Defender, of counsel), for appellant Alfred Beamon.

Michael J. Pelletier and Maria Harrigan, both of State Appellate Defender's Office, of Chicago, for appellant Quinton Moore.

John O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Gael O'Brien, and Kenneth W. Goff, Assistant State's Attorneys, of counsel), for the People.

JUSTICE EGAN delivered the opinion of the court:

The defendants, Alfred Beamon and Quinton Moore, were tried together by separate juries. Both were convicted of murder, residential burglary and armed violence and sentenced to 80 years' imprisonment.

Both defendants contend that the judge erred in denying their motions to suppress their statements, that the State made prejudicial arguments to the jury and that their sentences were excessive. We have determined that no reversible error occurred during the State's argument and that the sentences were not excessive. We have also determined that this case must be remanded for a new hearing on the defendants' motions to suppress their statements.

William Brown, the great-grandson of the deceased, Robert Moody, lived with Moody in a basement apartment before December 1986. His mother, Sandra Jones, lived with his sister, Kiesha Merritt, in the ground-floor apartment. The defendants were neighborhood friends of Brown and had been in Moody's apartment before. In November, Brown told the defendants that he was moving out of Moody's apartment to live with his grandmother.

On December 8, 1986, Sandra Jones received two phone calls from her grandfather. He said that both defendants called looking for Brown. Sandra then called Brown, who came home and stayed with the deceased that night. The next morning he tried to call the defendants, but neither was home. He then tried to find them in the neighborhood.

On the evening of December 17, Sandra Jones cooked dinner for her grandfather, who was 76 years old. He was well, and his apartment was in order. On the following morning, Kiesha Merritt went downstairs to her grandfather's apartment. She found him dead, lying on the floor of his living room. Sandra called for an ambulance. Before the paramedics arrived Sandra searched for the deceased's wallet to get his medical card, but she could not find it.

The police arrived. There was a rubber hose around the deceased's neck and puncture wounds on his body; three knives were discovered nearby. A bent knife was on the floor, another on a chair, and another in a bowl of liquid. Blood was discovered on the knife found on the floor and the one on the chair. The bedroom the de-

ceased slept in had been ransacked. His personal telephone directory was lying in his drawer with the "B" and "M" pages ripped out. The defendants' numbers had been in the directory but were no longer there. Brown found the deceased's empty wallet under a mattress.

By stipulation to the testimony of the medical examiner, it was established that death was caused by strangulation and that "multiple stab wounds" were a significant factor contributing to the cause of death.

The defendants were arrested and subsequently confessed. Their confessions established the following: On December 18, they met at Beamon's house at approximately 8:15 a.m. After discussing their lack of money, they decided to go to the deceased's apartment to try to get some money from him. They had been at his apartment on several occasions and were aware that he lived alone. They arrived at the deceased's home, and Moore rang the bell. The deceased let them in, and the three men talked and watched television. After sitting for awhile, the deceased got up and walked to the back door of his apartment. Once the deceased left the room, Moore went to the dresser and attempted to take some money out of the deceased's wallet. As Moore was attempting to take the money, the deceased began walking back into the room. Moore attempted to conceal his actions, but the deceased had seen him. He accused the defendants of trying to steal his money. Moore then grabbed the deceased from behind and put him in a headlock. Moore began choking the deceased, and the two fell onto the bed. At this point the defendants' accounts differed.

Moore said that after he and the deceased fell onto the bed, Beamon stabbed the deceased with a knife. The knife bent, so Moore went to the kitchen to get another knife and returned to further punch and stab the deceased. Moore then went to the bathroom and returned with a rubber enema hose. He wrapped the hose around the deceased's neck, gave one end to Beamon and held on to the other end. Moore then took approximately $65 from the deceased's wallet, and they left.

Beamon said that Moore choked the deceased for approximately 15 minutes, during which time he told Beamon to act as a look-out. After 15 minutes, Moore released his lock on the deceased's neck, and the deceased fell to the floor. Beamon then checked the deceased's pulse; he told Moore that he felt a pulse; Moore grabbed the wallet, and they left.

After running from the apartment, the defendants went to a local liquor store where they used the stolen money to purchase a six-pack

of beer and a half-pint of brandy. They then went to Beamon's home to watch television and drink the alcohol.

We will first address the defendants' claim that prosecutorial misconduct requires a new trial. Before trial Beamon made an oral motion *in limine* to bar any reference to the fact that Beamon had been given a polygraph test. The prosecutor told the judge that he had instructed the police officer not to mention the polygraph test even if the defense lawyers asked questions "relative to that area." During rebuttal closing argument, the prosecutor did inform the jury that Beamon had taken a polygraph examination. It is Moore, not Beamon, who contends that reference to Beamon's polygraph test prejudiced him. It is the State's position that the statement in rebuttal was invited by the argument of Moore's attorney.

■ An analysis of the issue appropriately begins with the following exchange during the closing argument of Moore's attorney:

"[DEFENSE ATTORNEY]: I want you to ask yourselves, ladies and gentlemen, I'm going to start now and I'm going to talk about what some of the reasons, doubts in this case, and I want to ask yourselves, who I want my opponent, and *I want him to answer to you.* Why was Mr. Moore treated differently, why was Mr. Moore treated differently from Beamon. Why is that, as you heard when Beamon—

[ASSISTANT STATE'S ATTORNEY]: Judge, at this time I am going to interrupt because we should have a side bar here *because there has been rulings in this courtroom what we can't bring into [sic].*

THE COURT: I haven't heard what he said. [Emphasis added.]

* * *

[DEFENSE ATTORNEY]: They didn't take down one note of one thing that [Moore] said for the fourteen hours he was in custody before he supposedly gave that statement. Why would they treat him different?

* * *

What did he say he did with that supposed statement that he took from my client, he never recorded it, he never even made a note about that supposed statement he took from my client.

Are you going to buy that, ladies and gentlemen, and if so, why, why are they treating my client different. [The police officer] says that's important in a homicide investigation, why isn't

it important when it comes to Mr. Moore also, they haven't framed their evidence yet, ladies and gentlemen."

The assistant State's Attorney began his rebuttal argument by referring to Moore's attorney's argument that Moore was being "framed." Later the following occurred:

"[ASSISTANT STATE'S ATTORNEY]: [Moore] goes to the police office, to the police station, does it sound like something he wouldn't do? He's telling them he wasn't there, he didn't do it the first couple of times and he wants to know why is this man treated differently than Mr. Beamon. Mr. Beamon is taken down to 11th and State because he says he'll go down there, there is an investigation that's going on.

[DEFENSE ATTORNEY]: Objection, your Honor.

THE COURT: Counsel, you opened it up.

[ASSISTANT STATE'S ATTORNEY]: He's down there taking a lie detector test.

[DEFENSE ATTORNEY]: Ask for a mistrial.

[ASSISTANT STATE'S ATTORNEY]: That's the difference that's being done.

THE COURT: Proceed, counsel.

[ASSISTANT STATE'S ATTORNEY]: That's what's being done to Mr. Beamon, not his client, Mr. Beamon.

THE COURT: You opened it up, you can't do that, proceed."

Moore argues that his attorney questioned the fact that Beamon was treated differently from Moore because the police took notes on Beamon's oral statements and not Moore's. Consequently, he maintains, the prosecutor's remarks were not invited.

Although the defendant's argument is not without some basis, we believe the remarks of Moore's attorney were broad enough to justify the prosecutor's response. Moreover, during Moore's attorney's closing argument the prosecutor placed Moore's attorney on notice that he was entering an area that had been proscribed. He insisted on forging ahead without requesting any clarification by the judge. Under all the circumstances, he may not now complain. (See *People v. Dixon* (1982), 91 Ill. 2d 346, 438 N.E.2d 180.) In addition, we have difficulty finding any prejudice to Moore in the remarks. Moore's claim that the jury *might* conclude that Beamon was cooperative, but Moore was not, is most tenuous.

■ Moore also maintains that error occurred during his attorney's following closing argument:

"[DEFENSE ATTORNEY]: This oral invitation, an invitation he couldn't refuse, they don't want you to believe they handcuffed him, they told you they admitted to you, that officers stated to you I didn't have any evidence to arrest Quinton Moore when I invited him down to the station, he wasn't there, and if they arrested him and brought him down to the station and got some evidence, *it was wrongfully obtained, ladies and gentlemen, and that's why they can't admit to that.*

[ASSISTANT STATE'S ATTORNEY]: Objection, Judge, you're the person to determine whether or not a bad arrest has been made, and that's been heard already and counsel knows better.

THE COURT: Let's go, counsel." (Emphasis added.)

We first judge that the defendant has waived this point because he did not object to the remark; second, we again judge that the prosecutor's remarks were invited by the defendant's attorney's argument that the evidence was wrongfully obtained. Last, insofar as the jury was concerned, the objection was of such a technical nature that any possible error in the remark was harmless.

The two cases cited by the defendant are not in point. In *Crane v. Kentucky* (1986), 476 U.S. 683, 90 L. Ed. 2d 636, 106 S. Ct. 2142, the defendant was prevented from showing the manner in which his confession was secured. In this case, the defendants were given every opportunity to introduce testimony describing the length of the defendants' interrogation and the manner in which the interrogation was conducted. In *People v. Carter* (1979), 73 Ill. App. 3d 406, 392 N.E.2d 188, the prosecutor told the jury, "This court has ruled it was a proper procedure"; "this court has ruled that the procedure was constitutional"; and "the court has already ruled in pre-trial." Later in rebuttal argument, the prosecutor insisted at length, over repeated objections, which were sustained, that the court had already ruled that the identification procedure was proper. The appellate court held that the prosecutor's remarks were not invited. Factually, *Carter* is wide of the mark.

■ Beamon contends that reversible error occurred when the prosecutor said that the victim had "twenty-seven stab wounds" (by stipulation it was established that he had been stabbed twice) and that the police investigation revealed "a bent knife that wasn't bent before." Beamon points out that there was no evidence that the knife was not bent before the incident. We find no prejudicial error in those remarks. No objection was made to either of them. It is obvious that the prosecutor misspoke about the number of wounds, but Beamon's

lawyer later told the jury that the deceased had three knife wounds. The jury was instructed that the statements of counsel were not evidence. The independent evidence established that a bent knife was recovered. The prosecutor's argument that the knife was bent because the defendant struck bone when he stabbed the deceased was a reasonable inference from the evidence.

■■ Beamon had made a number of oral statements before he finally confessed. Those oral statements were not introduced by either the State or the defense. Beamon's attorney made the following argument:

> "And it's mighty funny that of seven, at least seven conversations that we know of, they chose to introduce just one, think about it. Evidence is not always what you get, but you also have to look at what you don't get and they have the burden of proof, not us, we don't have to prove a thing."

In response to that argument the prosecutor said this:

> "Why don't we bring in those other statements, [Beamon's lawyer] knows there is [sic] rules of evidence, there is hearsay."

Beamon now contends that that remark constituted reversible error. Again we disagree. Again we believe the remark was invited. Further, this remark also was of such a technical nature that we do not believe it would have had any effect on the jury.

The judge later explained that he ruled as he did because he construed Beamon's attorney's remarks to include statements from other witnesses. The prosecutor said that that was the reason for his objection. The judge offered to clarify his ruling to the jury; his offer was not accepted.

Before leaving this question we wish to make it clear that we do not agree with the State's implied argument that the prosecution may never introduce a defendant's exculpatory statement. Nor are we prepared to say that a defendant may never introduce his denials made before making an inculpatory statement. Such otherwise self-serving evidence would not be admissible to prove the truth of the statements but would be admissible on the question of whether his subsequent confession was voluntary.

■■ The prosecutor told the jury that Beamon had lied to the police and that he told them things that did not "jive" with the evidence they had. Beamon contends that those arguments constituted prejudicial error. Again we do not agree. That argument was based on reasonable inferences from the evidence. A police officer testified that Beamon told him he had not been out of the house for several days, that he had had the flu, and that he had not seen Quinton Moore since

the beginning of December or the end of November and that he had not been to the deceased's apartment in several months. At that time the police officers told him what Moore had said. Beamon persisted in the story that he had already told. The prosecutor had the right to argue that the confession was true and that the exculpatory versions given by Beamon were false.

Beamon also refers us to other arguments of the State which, he contends, were inflammatory. We judge that no error occurred in the instances to which Beamon refers. They were all supported by the evidence. For these reasons, we conclude that the prosecutor's closing arguments did not constitute prejudicial and reversible error.

Both defendants maintain that their sentences were excessive. Moore was 17 years old at the time of his arrest and a junior in high school. Beamon was 18 years old. Neither had any criminal record and neither was employed. The prosecutor pointed out that Beamon was eligible for the death penalty. Moore was not eligible for the death penalty because he was under 18 years of age. The State asked that both be sentenced to terms of natural life without parole or to an extended term. Due to the brutal nature of the crime and the age of the victim, the defendants were eligible for an extended term of between 40 and 80 years. (Ill. Rev. Stat. 1985, ch. 38, pars. 1005—8—2(a)(1), 1005—5—3.2(b)(2), (b)(4).) The defendants do not contend that they were not eligible for an extended term.

■ It would serve no purpose to discuss the many cases cited by the State affirming sentences (*e.g., People v. Edens* (1988), 174 Ill. App. 3d 1033, 529 N.E.2d 617; *People v. Jones* (1983), 119 Ill. App. 3d 615, 456 N.E.2d 926) and those cited by the defense reducing them (*e.g., People v. Smith* (1989), 178 Ill. App. 3d 976, 533 N.E.2d 1169; *People v. Anderson* (1985), 142 Ill. App. 3d 240, 488 N.E.2d 557). Suffice it to say that each case must be decided under its own facts. Of most importance is the rule that the primary responsibility for sentencing rests with the trial judge and that a reviewing court may interfere only when it is convinced that the judge abused his discretion. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) The test in reviewing the propriety of a sentence is not what we, as a reviewing court, would have done; the test is whether we can say that the trial judge abused his discretion. Contrary to the defendants' arguments, we cannot say that the trial judge ignored all of the relevant factors in deciding punishment. He did point out that it was one of the worst cases he had had before him in his 19 years on the bench. No one can deny that the strangulation of a 76-year-old man in his own home in the course of a robbery is an exceptionally heinous

crime. We conclude that we cannot say that the judge abused his discretion in this case.

We turn now to the defendants' claims that they were illegally arrested and that their confessions resulted from their illegal arrests.

On December 19, 1986, at 8:30 a.m. five Chicago police detectives, William Tock, Edward Winstead, Patrick Flynn, James Kierse and Lawrence Ashe, all of whom testified, went to the home of the defendant Quinton Moore at 6401 South Eberhart. Tock, Winstead and Flynn had been asked for assistance by Kierse and Ashe, who wanted to talk to Quinton Moore about the murder of Robert Moody. Kierse and Ashe told the others that they also had a warrant for Quinton Moore's brother Gershon for attempted murder. He was supposedly armed and dangerous. Upon arriving at the Moore house, Tock and Winstead went to the rear, Flynn went to the side and Kierse and Ashe went to the front door. Winstead was instructed to arrest anyone who tried to leave the building. Tock next saw Kierse when Moore's mother opened the back door and motioned the officers to come in. Once inside, Tock saw other officers enter Quinton Moore's bedroom.

Edward Winstead testified that he entered the home and saw Quinton Moore lying in bed. He heard yelling and arguing going on between Mrs. Moore and the police. She said there could not be any warrant for her son Gershon because he was already in jail. Winstead went into the bedroom and was joined by Kierse. Winstead asked the defendant who he was and where Gershon Moore was. The defendant said that Gershon was in jail. Winstead looked under the bed and in the closet. Winstead asked Kierse if he needed anything else and, when Kierse said he did not, Winstead, Tock and Flynn left.

At 10 a.m. that same day, all five officers went to Beamon's home at 6709 South Rhodes. Winstead testified that Ashe and Kierse again asked him and the others for assistance because they wanted "to go and try to pick up or at least talk to another defendant *** or another suspect in this incident." When they arrived, Tock, Flynn and Winstead went to the rear, while Kierse and Ashe went to the front door. Kierse and Ashe went into the house and were there for only a few minutes when they left with Beamon.

James Kierse testified that he spoke with William Brown, who informed him that the word on the street was that the defendants, Beamon and Moore, had burglarized his grandfather's apartment on a previous occasion. After the murder, when Kierse went through the deceased's personal items, he noticed that the "B" and "M" pages were missing from an address book. Kierse was also informed that

there was a warrant out for the arrest of Gershon Moore. When he learned this he contacted Winstead, Tock and Flynn and asked for their assistance. He told them that they had to talk to Quinton Moore and to see if Gershon Moore was at home. Upon arriving at the Moore house, Kierse knocked on the front door, and Moore's mother answered. She let the detectives in and accompanied Kierse to the rear door. Kierse then unlocked the rear door and went into the bedroom where he saw the defendant. He told the defendant that they would like to talk to him about an incident that occurred at the deceased's home. He asked Moore if he would accompany the police officers to the station, and "he agreed." He could have elected to stay in the house if he chose. Kierse, Ashe and the defendant left the house together. The defendant was not advised of his rights, was not handcuffed, and no guns were ever drawn. The defendant was dressed when they found him, but he had to put on shoes and a jacket.

When they arrived at the Area 1 Detective Division at 51st and Wentworth, Moore was taken to an interview room. Ashe read him his rights and began questioning him. Kierse testified that Moore was free to go. After talking with him, Kierse and Ashe then left and went to Beamon's house. Moore was left in the room at the detective area for about one hour and 45 minutes before the detectives returned. Moore had been told that the detectives would be back, but he was not told he was free to leave.

When they reached Beamon's house, Tock, Winstead and Flynn were in the rear, and Kierse and Ashe went to the door which was on the side of the house. Beamon's stepfather answered the door, and let Kierse and Ashe in. The stepfather then went upstairs and returned with Beamon. Kierse and Ashe told Beamon they wanted to interview him regarding an incident that happened at the deceased's house. Beamon accompanied the officers back to the Area 1 Detective Division.

Once at the police station, Kierse advised Beamon of his constitutional rights and talked with him. After talking with Beamon, Kierse found a discrepancy between what he said and what Moore had said. Beamon said that he had been sick for several days with the flu and had no company for a couple of days. Moore had said, however, that he was over at Beamon's the day before the 18th and had been drinking with Beamon. Kierse then asked Beamon to take a lie detector test, and Beamon agreed. Beamon was taken to 1121 South State Street, and Detective Pat Garritty administered a polygraph examination to Beamon. After approximately 30 minutes, Kierse took Beamon back to Area 1, but on the way, they stopped at Burger King to get

some food for the defendants. This was the only food given to Moore all day. Upon returning to Area 1, Beamon was again placed in one interview room, while Moore was in another.

At about 4 p.m., Kierse again talked with Beamon. Beamon was again told his rights, and he then gave another inculpatory oral statement. (He had made his first inculpatory oral statement at 11th and State after he was told he had failed the polygraph test.) At approximately 6 p.m. Beamon was placed under arrest. He had never been told before that he could leave. Kierse and Ashe then returned to Moore, and Ashe read him his rights.

Detective Patrick Garritty testified that at approximately 2 p.m. on December 19, 1986, he conducted a polygraph test on Beamon. Beamon consented to the examination by signing a polygraph waiver form. After a 30- to 40-minute examination, Garritty informed Beamon that he had failed the test. At that point, Beamon said he would answer the questions truthfully. After Beamon gave a "true story," Garritty informed Kierse and Ashe.

Lawrence Ashe testified that he, Kierse and Flynn identified themselves to Mrs. Moore, who answered the door. She allowed the detectives to enter, and Kierse and Flynn went with Mrs. Moore to open the rear door for Tock and Winstead. Ashe told Mrs. Moore that they were looking for her son, Gershon, because they had a warrant for his arrest. Mrs. Moore informed them that Gershon was in prison. Ashe first saw Quinton Moore coming out of his bedroom with Kierse. Ashe remembers Mrs. Moore being on the phone at some point, but she never asked the officers if they had a warrant. He testified that Mrs. Moore was told where they were taking her son. At the station, Moore was taken to an interview room where Ashe advised him of his constitutional rights. Ashe spoke to Moore for a brief period and then told him they would return.

Ashe went to Beamon's home with the other detectives. Shortly after they arrived, Beamon came down the stairs with his stepfather. Beamon accompanied the officers to the police station, and he was not handcuffed. He was placed in a lineup room at the station, where he was asked a few questions. He was read his constitutional rights before any questioning took place. After some time, Beamon agreed to take a lie detector test. He was taken to 1121 South State Street at about 1 p.m. and was given a lie detector test by Garritty.

They arrived back at the police station at about 4 p.m. Kierse read Beamon his rights again and talked to him more about his involvement in the Moody murder. Ashe went back to talk to Moore; he read Moore his rights; and Moore then gave his inculpatory state-

ment. Ashe next contacted the felony review unit, and Assistant State's Attorney Tom Bilyk arrived. Before questioning Moore, Bilyk again read him his constitutional rights. At about 10:30 a.m. a court reporter arrived and took Moore's statement which was later signed by Moore. At 12:40 a.m., December 20, a court reporter statement by Beamon was prepared and at 2:45 a.m. Beamon signed it.

Beamon's stepfather, Clarence Samuels, testified that when he opened the door three police officers "walked in on their own." He did not try to stop them. He did not feel he could tell the officers to leave. The officers followed him to a bedroom, woke up Beamon, and ordered him to get dressed because then wanted him to answer some questions. The officers did not tell Beamon that he was under arrest. They handcuffed Beamon. They explained that they only wanted to question him for a couple of hours; it was necessary to handcuff him "to make sure he didn't try to run off or anything."

Sadie Samuel, Beamon's mother, was at work when the police officers left her home with her son. After her husband told her that the police had picked her son up, she went to the police station at 51st and Wentworth between 3 and 3:30 in the afternoon. She was told by a police officer he was not there. She waited until 5, after a new shift came on duty. She was told at that time that he was "with the officers." She left and returned about midnight because she had not heard from her son. An officer told her that her son was upstairs and that she could not see him. She left and returned with her daughter and her son's girlfriend about 1:30 a.m. She was told he was still upstairs and that she would have to wait. She was able to see him at 4:30 that morning. His face was flushed and his eyes were all puffy; he looked like he had been crying.

Dorothy Moore testified that her son Gershon was in jail at the time the police came to her home. (Her mother had testified that Gershon had been in jail for two months.) She unlocked the padlock on the front door to push it open; one of the policeman pushed the door open and said, "What is your name?" When she said, "Dorothy Moore," that officer and another one started to swear at her; then they pushed her back into the house against the wall. When other persons started coming in through the house, she asked them who they were. She said, "You don't have a search warrant, you can't come in my house." One of the officers said, "We came here to pick up Gershon Moore and Quinton Moore on a strong armed robbery." She said that they could not have come to pick up Gershon Moore because he was gone. One of the officers told her if she didn't shut her mouth they were going to drag her off to jail.

Some of the officers went in her bedroom; one of them took her purse and dumped the contents on a table; another officer told her that he could do what he pleased and, if she didn't shut up, he would drag her out of her house without any shoes on. At the time her son, Quinton, was in the bedroom sleeping. One of the officers kicked open the bedroom door. Another officer broke the glass in the back door off the kitchen. She was not permitted to walk around; one of the officers had "cornered" her in the kitchen. When the police were leaving with Quinton he told them to wait a minute, that his mother was all excited. One of the officers kept jerking on Quinton and told him to put his hand behind his back. He then handcuffed Quinton. When she asked where they were taking him, an officer told her it was none of her "damn business." After they left she began calling around trying to find out where Quinton was. When she called 51st and Wentworth they said they didn't know anything about him. She got there around 4:30 the following morning.

One officer poked Quinton and asked his name. When her son told him, "Quinton Moore," the officer said, "This is the damn person here." When Quinton got out of bed he had a sleepwear bottom on but no shoes or socks. (A picture taken of Moore at the station several hours later showed that he was not wearing socks.) The officer told Quinton he wanted to question him about something.

Quinton Moore testified that he was asleep and was awakened by the police officers, two of whom had guns out. They told him they were looking for "Alvin [sic]" Moore, and when he identified himself as Quinton Moore they said that they were going to take him instead. He left because the police officers took him. He was handcuffed with his hands behind his back. When they got to 51st and Wentworth, he was taken to a windowless room and handcuffed to a wall. They were gone between 30 minutes to 2 hours. Officers Kierse and Ashe came in and uncuffed him and took him into another room. When Kierse asked him what he knew about the murder, he told Kierse he did not know anything. Up to that point he had not been given *Miranda* warnings. After that conversation they put him back in the same room he had been in before and again handcuffed him to the wall. They left him there for about two hours. They again spoke to him but did not give him any *Miranda* warnings. He was placed back in another room for about one hour. They questioned him again for about 30 minutes. The door of the room was locked. Altogether he was questioned for about five or six hours. He was struck twice in the face by Kierse. He testified that Kierse told him that he would take him down somewhere by the lake, handcuff him to a tree and "beat

the hell out" of him. He was not given any food. He did not eat anything that day. The assistant State's Attorney was the first one to give him *Miranda* warnings.

The State did not call any rebuttal witnesses. However, all of the officers except one had previously testified that the defendants were not handcuffed when they left their homes. Winstead said he did not recall. Some of the officers had also testified that no guns were ever drawn. We interpret Kierse's testimony to be the equivalent of a denial that he ever struck or threatened Moore.

In his ruling denying the motions to quash the arrests and suppress the statements, the judge expressly found that Quinton Moore was not a credible witness. He said that the police did not have probable cause to arrest the defendants when they went to their homes but that the police went to the defendants' homes to question them. We construe his remarks to be a finding that Beamon and Moore were not under arrest when they left their homes and that they went with the police voluntarily to answer questions. It is the State's position that the arrests of the defendants took place at 6 p.m., approximately 10 hours after the police and Moore left his home and eight hours after they left with Beamon.

■ The question whether the defendants' consent to accompany the police officers was, in fact, voluntary or was the product of duress or coercion, expressed or implied, is to be determined by the totality of all the circumstances and is a matter which the State has the burden of proving. *United States v. Mendenhall* (1980), 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870.

Both sides have cited a number of cases on the question. We believe all of the State's cases are distinguishable in varying degrees from the facts of this case. In *People v. Gutknecht* (1984), 121 Ill. App. 3d 839, 460 N.E.2d 60, and *People v. Johnson* (1989), 187 Ill. App. 3d 756, 544 N.E.2d 392, the appellate court held that the officers had probable cause to arrest. In *People v. Clay* (1984), 124 Ill. App. 3d 140, 463 N.E.2d 929, the defendant testified that he did not believe he was under arrest and that the police told him he was not under arrest. In *People v. Gale* (1979), 72 Ill. App. 3d 23, 390 N.E.2d 921, the defendant, in the presence of a group of people, was approached by a single police officer in a public park who asked him to come to the police station to discuss a motorcycle theft, which an informant had accused the defendant of committing. The defendant agreed to accompany the officer who said he would bring the defendant back to the park later. At the station, the officer confronted the defendant with the informer's accusation, and the defendant con-

fessed within 20 minutes after an initial denial. In *People v. Miller* (1980), 89 Ill. App. 3d 973, 412 N.E.2d 175, the police met the defendant at a parking lot and went to his apartment where he was questioned for one-half hour. The police asked the defendant to accompany them to the police station. The defendant told one police officer privately that he had some marijuana, and the officer agreed not to arrest him for possession. On the way to the station, the defendant began crying and confessed. In *People v. Reed* (1982), 104 Ill. App. 3d 331, 432 N.E.2d 979, three police officers went to the defendant's apartment. The defendant's girlfriend was present. She testified that the police officers asked the defendant to accompany them to the police station and that he agreed. At his request, she was permitted to accompany him. At one point in his own testimony, the defendant said he did not know the men were police officers when he went with them. We repeat that none of the State's cases is factually apposite.

■ On the other hand, we judge that the defendants have cited cases which are strong authority for their position. The facts of this case are, in large measure, similar to those of *People v. Avery* (1989), 180 Ill. App. 3d 146, 534 N.E.2d 1296. In *Avery* the three defendants went with the police to the police station at different times. The age of one of them was 18; we surmise that the other defendants were of a similar age. They were left in separate interrogation rooms and were questioned several times. They were left alone for hours at a time. The police confronted one of the defendants with the version of the facts given by a second defendant which contradicted the version given by the first defendant. The appellate court reversed the finding of the trial judge that no arrest took place when the defendants were taken from their homes. The appellate court emphasized the fact that the defendants were not told they were free to leave and concluded that they could reasonably believe they could not leave, especially when each defendant was left in an interrogation room and simply told that the officers "would get back to him." 180 Ill. App. 3d at 146.

In *People v. Vega* (1990), 203 Ill. App. 3d 33, 560 N.E.2d 983, this court reversed a finding that the defendant had not been arrested and had voluntarily accompanied the police. In doing so the court repeated that the "test is whether, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (203 Ill. App. 3d at 41.) The court then repeated the relevant circumstances. It pointed out the defendant's age and his absence of extensive experience with the criminal system; the fact that he was not questioned at all in his home; that he was not told that he

could refuse to accompany the police; that he was not given the choice of arranging his own transportation to the station; that he was placed in an interrogation room at the station; and he was not told he was free to leave. All those circumstances exist in this case as do the facts in *Avery*: the defendants were left alone in interrogation rooms and they were questioned intermittently.

Add to those facts the fact that both defendants were roused from their beds and there were five police officers in their homes, three of whom had been stationed outside initially and were instructed to arrest anyone who tried to leave. The State seeks to justify that show of force because of the alleged existence of a warrant for the arrest of Gershon Moore. That justification does not exist in the case of Beamon. In the case of Moore, it is conceded that a dispute arose between his mother and the police. There was "yelling and arguing." The setting in both homes strongly militates in favor of an argument that a reasonable person would believe that he had no choice but to accompany the police officers.

According to Kierse and Ashe, Beamon made an inculpatory statement at 11th and State after failing the polygraph test. They were aware, therefore, at that point that Beamon had named Moore as his accomplice in the murder of Moody; and yet they did nothing to alert the other officers at 51st and Wentworth to insure that Moore not be permitted to leave. Unless he was already detained, we find that testimony unreasonable. We judge, therefore, that the manifest weight of the evidence establishes that the defendants were under arrest when they left their homes with the police officers. Further support for our holding exists in *People v. Young* (1990), 206 Ill. App. 3d 789, 564 N.E.2d 1254, *People v. Gordon* (1990), 198 Ill. App. 3d 791, 556 N.E.2d 573, and *People v. Sturdivant* (1981), 99 Ill. App. 3d 370, 425 N.E.2d 1046, in which this court reversed findings that arrests had not been made and that the defendants voluntarily accompanied the police. In *Sturdivant*, the court rejected, out of hand, the State's implied argument that a defendant had "freely chose[n] to remain in the police station for approximately 9 hours." 99 Ill. App. 3d at 372.

The defendants insist that there is no evidence attenuating the effect of the illegal arrest and the defendants' subsequent confession and, therefore, that the defendants' convictions must be reversed because there is insufficient evidence to convict in the absence of their confessions. The hearing on the admissibility of the confessions focused on the legality of the arrest. Scant, if any, consideration was given to the question of attenuation. In *Vega* and in *Young*, because the question of attenuation had not been considered, this court re-

manded for the trial judge's determination of whether sufficient attenuation existed to purge the statements made by the defendants from the taint of their earlier seizures. We believe the reasoning of *Vega* and *Young* is sound. We therefore reverse the finding of the circuit court that the defendants were not arrested when they were taken from their homes; the cause is remanded for a hearing to determine whether there was sufficient attenuation to purge the defendants' statements from the taint of the earlier arrests. If the court finds such attenuation, it is directed to reinstate the judgment of conviction. If the court finds no such attenuation it is directed to suppress the statements and to conduct further proceedings consistent with the views expressed herein.

Cause remanded with directions.

RAKOWSKI, P.J., and McNAMARA, J., concur.