THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CRAIG BARLOW, Defendant-Appellant.

First District (3rd Division)    No. 1—93—0667

Opinion filed June 21, 1995.

Rita A. Fry, Public Defender, of Chicago (Andrea Monsees, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee G. Goldfarb, Christine Cook, and Michael F. Bonaguro, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE GREIMAN delivered the opinion of the court:

Following a jury trial, defendant was convicted of first degree murder and sentenced to 55 years' imprisonment.

On appeal defendant raises three issues: (1) whether defendant's confession given at the police station should have been suppressed as the product of an unlawful arrest; (2) whether the trial judge committed plain error by responding to two jurors' notes by advising the jury that he could not answer their questions; and (3) whether the 55-year prison sentence is excessive.

We find that defendant was illegally under arrest while locked in an interview room in a police station overnight and remand the matter to the trial court for an attenuation hearing to determine whether his confession should have been suppressed. We also find that the trial court did not err in responding to questions posed by two jurors and did not abuse its discretion in the imposition of sentence.

On July 5, 1991, about 5:28 p.m., the dead body of Lynette Lang was found severely beaten, strangled, stripped, wrapped in a blanket and discarded in a garbage can in an alley at 2152 West Monroe. The medical examiner could not determine the exact time of the victim's death. About 5:45 p.m. Detective Joseph Walsh, while working the 4:30 p.m. to 1 a.m. shift, was assigned to investigate the homicide.

On July 6, 1991, about 4:30 p.m., Detective Walsh was informed that the victim had been identified by family members as Lynette Lang. Following interviews with family members of the victim and other persons, Walsh determined that defendant was one of the last persons seen with the victim. Unable to locate defendant, Walsh spoke with defendant's family, including defendant's brother Curtis, and instructed them to have defendant contact the police.

On July 8 about 10 p.m., while off duty, Walsh received a telephone call at home from the police station and was told that Curtis Barlow was in the police station and wished to talk to Walsh. Walsh went to the station and spoke with Curtis, who told Walsh that his brother Craig, defendant, was waiting outside the station.

About 10:30 or 11 p.m., Walsh and Curtis went outside. Walsh introduced himself to defendant and all three men (Walsh, Curtis and defendant) proceeded to the second floor of the police station. Walsh told Curtis that he was welcome to stay if he wished but that the conversation with defendant would take some time. Curtis then left the station.

After advising defendant of his *Miranda* rights, Walsh questioned defendant for about one to two hours in an interview room. During the questioning, defendant recounted his activities from July 4 through July 7 or 8. On July 4, defendant attended a family picnic in Chicago and left in the evening hours with his brothers Curtis and Lawrence and Curtis' family. After driving Curtis' family home to Oak Park, the three Barlow brothers (defendant, Curtis and Lawrence) proceeded to acquire and use cocaine and then purchased some beer. While they were drinking the beer, two girls they knew joined them, *i.e.*, the victim, known as Goo, and Micky. During the next several hours, the entourage purchased more cocaine, visited a smoke house, and purchased and drank more beer. Eventually only four people remained in Touhy Park where they were drinking, *i.e.*, defendant, the victim, Micky and Garland Henderson (a/k/a Toto, Micky's boyfriend). As the sun was rising, defendant and the victim went their separate ways, apparently because defendant had run out of money.

Defendant maintained that when he parted company with the victim, he went to a third-floor apartment in Rogers Park where his sister (Debra Barlow) was staying with a friend named Frances Cook. Defendant recalled that his sister mentioned it was 6 a.m. and he left there by 7 a.m. From Cook's apartment, defendant went to the public aid office at 445 North Sacramento and then to the currency exchange at Madison and Western. For the next couple of days, defendant purchased and took drugs at different locations, generally staying in Garfield Park.

After obtaining defendant's statement about midnight or 1 a.m., Walsh went to the Cook apartment but found no one home and left a business card with instructions to have Cook contact him as soon as possible. Walsh then went to the public aid office on Sacramento and to the currency exchange at Madison and Western but both offices were closed.

About 6:15 a.m. on July 9, Walsh returned to the police station. Shortly thereafter Frances Cook called and informed Walsh that neither defendant nor his sister was in her apartment on the night of July 4. Walsh did not speak to Debra Barlow regarding this investigation.

About 7 a.m. Detective Walsh told defendant about Ms. Cook's conversation and defendant insisted that he was at Ms. Cook's apartment. With defendant's consent, Walsh scheduled a polygraph examination for the first available appointment which was at 6:30 p.m. that same night at the crime lab. Walsh then went off duty and later returned to the police station between 4 and 4:30 p.m. About 5 p.m.

Walsh spoke to defendant and took him to the crime lab for the 6:30 p.m. appointment. The record is silent for the time period between 7 a.m. and 5 p.m.

About 9:30 p.m., after the polygraph exam, Walsh and defendant returned to the police station. About 10 p.m. Walsh told defendant that several discrepancies appeared in his version of the events and defendant stated he wanted to tell the truth. The arrest report states the time of arrest as 10 p.m. on July 9.

After Walsh again advised defendant of his *Miranda* rights, defendant stated that during the evening in question (July 4 through 5) he had made an agreement with the victim in which he would buy her cocaine or beer in exchange for her performing an act of oral sex on him. When he asked her to keep her part of the bargain, she declined, slapped him and ran. Defendant chased her and when he caught her, he started kicking her numerous times, took off her clothes and also hit her with an aerosol can. Defendant entered an abandoned building, obtained shoe strings, stuffed tissue in the victim's mouth and wrapped the shoe strings around her neck to stop her from moaning. Defendant went back into the building, got a blanket, wrapped the victim in the blanket and threw her in a garbage can. Defendant recalled the events taking place in the early morning hours of July 5 but did not know the exact time.

About 10:15 or 10:30 p.m., Detective Walsh then contacted the felony review unit of the State's Attorney's office. About 11 p.m. an assistant State's Attorney began his conversation with defendant. After being advised of his *Miranda* rights, defendant reiterated the same confession and opted to have his confession reported in the form of a handwritten statement as opposed to a court-reported statement. Defendant provided a six-page confession dated on July 9 about 11:50 p.m.

Before trial defendant first filed a motion to quash arrest and suppress evidence. At the hearing on this motion, defendant presented two witnesses, *i.e.*, his brother Curtis and himself. Both witnesses corroborated Walsh's testimony regarding the events of July 8 when Curtis and defendant arrived at the police station through the completion of questioning about midnight.

Defendant further testified that Walsh told him he was leaving to check defendant's story. Defendant later discovered that the door to the room was locked because he tried to open it to go to the washroom. Defendant did not feel free to leave the police station. The detectives did not show defendant an arrest warrant and did not tell defendant that he was under arrest. While Walsh was gone, defendant slept in the room by himself. The next morning (July 9), de-

fendant ate a sandwich and used the bathroom. Between the time Walsh left and returned, defendant did not feel free to leave the room and did not recall whether he asked to leave the room.

Detective Walsh also testified at the suppression hearing and provided the same testimony as recited above. In addition, Walsh testified that before he interviewed defendant at the police station, Walsh had spoken to Micky (a/k/a Felicia Ray) and Micky's boyfriend (Garland Henderson, a/k/a Toto), both of whom said that they were with defendant and the victim in the park on July 5 at 4 a.m. Walsh had also spoken to Arthur Green, who said he had seen the victim at a convenient store on July 5 about 10 or 11:30 a.m.

The trial court found that defendant was not in custody prior to the time he was told of his arrest, i.e., 10 p.m. on July 9. In light of this finding, the trial court denied defendant's motion to quash arrest and suppress evidence.

Defendant also filed a pretrial motion to suppress his confessions attacking the voluntary nature of the statements. At the hearing on this pretrial motion, Detective Walsh again testified. Walsh stated that he personally gave defendant something to eat and drink during the course of the time defendant was in the police station. In addition, defendant was allowed to use the washroom whenever he requested. The trial court denied this motion and it is not a part of defendant's appeal.

On appeal defendant first asserts that his confession should have been suppressed as the product of an unlawful arrest which occurred when the police locked him in an interview room at the police station for over seven hours and continued custody of him over the next 15 hours (7 a.m. to 10 p.m.) before obtaining his confession.

The State contends that the trial court properly denied defendant's motion to quash his arrest because defendant voluntarily came to the police station and was not arrested until after he confessed to the murder. Assuming that defendant is found to have been under arrest before he confessed, the State submits that sufficient circumstances intervened to attenuate defendant's confession from his allegedly illegal arrest. Even if the State is correct in this view, it requires an appropriate hearing in the trial court.

A trial court's decision on a motion to quash and suppress will not be disturbed on review unless that decision is determined to be clearly erroneous. (*People v. Williams* (1994), 161 Ill. 2d 1, 26, 641 N.E.2d 296; *People v. Halmon* (1992), 225 Ill. App. 3d 259, 271, 587 N.E.2d 1182.) In our review of a trial court's determination on a motion to suppress, we may also consider evidence adduced at trial. *Halmon*, 225 Ill. App. 3d at 268.

Restraint of a person's freedom of movement by a show of authority or by means of physical force constitutes an arrest. (*People v. Williams* (1994), 164 Ill. 2d 1, 11, 645 N.E.2d 844.) To determine whether an arrest has actually occurred, the court must determine whether a reasonable person, innocent of any crime, would have considered himself free to leave. *Williams*, 164 Ill. 2d at 11 (no arrest): *People v. Reynolds* (1994), 257 Ill. App. 3d 792, 799, 629 N.E.2d 559 (quashed defendant's arrest and suppressed his confession).

Although no one factor is dispositive in making the determination of whether an arrest occurred, the court can consider factors including (1) the time, place, length, mood, and mode of the interrogation; (2) the number of police officers present; (3) any indicia of formal arrest or evidence of restraint; (4) the intention of the officers; (5) the extent of the officers' knowledge; (6) the focus of the officers' investigation; (7) the subjective belief of the detainee concerning his arrest status; (8) any statement or nonverbal conduct by the police indicating that the detainee was not free to leave; and (9) whether the detainee was told that he was free to leave or that he was under arrest. *Reynolds*, 257 Ill. App. 3d at 799-800.

In the present case, we hold that the trial court erred in finding that defendant was not in custody prior to the time of his formal arrest at 10 p.m. on July 9. Defendant arrived at the police station about 10 p.m. on July 8 and was reported under arrest at 10 p.m. on July 9. In reviewing the evidence concerning the 24-hour period between defendant's voluntary arrival and formal arrest, it is difficult to conclude that he was not under arrest until the passage of 24 hours in confinement with police either in a locked room or in transport to and from a police station and a police lab or in a crime lab during a polygraph examination.

Defendant voluntarily accompanied his brother Curtis to the police station and agreed to answer questions regarding the murder investigation. The initial voluntary presence of a defendant at the police station, however, does not legitimize subsequent improper treatment of a defendant at the station. *People v. Young* (1990), 206 Ill. App. 3d 789, 801, 564 N.E.2d 1254.

Within a half hour of his arrival at the station, Detective Walsh placed defendant into an interview room and read him *Miranda* rights before one or two hours of questioning. Advising a person of the *Miranda* rights is recognized as a common indicia of arrest even though that fact alone is not conclusive to establishing an arrest. *Williams*, 164 Ill. 2d at 13; *People v. Armstrong* (1993), 244 Ill. App. 3d 545, 553, 614 N.E.2d 427.

When this initial interview ended, sometime between midnight and 1 a.m. on July 9, defendant was left in a locked interview room at the police station and Detective Walsh departed the police station for the purpose of checking defendant's statement as to his whereabouts on July 5, *i.e.*, the Cook apartment, a public aid office and a currency exchange. The United States Supreme Court has condemned the practice of detaining and arresting a defendant "to enable the police to conduct an expedition for evidence in the hope that something might turn up." *People v. Franklin* (1987), 115 Ill. 2d 328, 335, 504 N.E.2d 80, citing *Alabama v. Taylor* (1982), 457 U.S. 687, 693, 73 L. Ed. 2d 314, 321, 102 S. Ct. 2664, 2668-69; *Dunaway v. New York* (1979), 442 U.S. 200, 218, 60 L. Ed. 2d 824, 839, 99 S. Ct. 2248, 2259-60; *Brown v. Illinois* (1975), 422 U.S. 590, 605, 45 L. Ed. 2d 416, 428, 95 S. Ct. 2254, 2262.

After finding no one home at the Cook residence, Walsh then discovered, to no one's great surprise, that both the public aid office and currency exchange were closed. Detective Walsh returned to the police station about 6:15 a.m. Shortly thereafter Frances Cook called him to report that neither defendant nor his sister had been in her apartment on the night of the murder. About 7 a.m. Detective Walsh advised defendant of Ms. Cook's statement.

During the entire time Detective Walsh was attempting to verify defendant's statement until the time he advised defendant of Ms. Cook's statement (about midnight to 7 a.m.), defendant was kept in a locked interview room at the police station, left alone and never told that he could leave, unlike his brother who was advised that he might leave if he chose to do so. We believe that a reasonable person under these circumstances would have believed he was not free to leave.

The investigatory function of the police certainly necessitates station-house interrogations, and this function cannot be served properly if every such interrogation were held to be so custodial in nature as to constitute an arrest. (*People v. Wipfler* (1977), 68 Ill. 2d 158, 168, 368 N.E.2d 870.) This court, however, has continually rejected the proposed fiction that a person who voluntarily agrees to submit to interrogation at a police station also implicitly consents to remain in the police station while the police investigate the crime to obtain probable cause for the interviewee's arrest. *E.g.*, *Reynolds*, 257 Ill. App. 3d at 801 ("[a]lthough defendant was not handcuffed and the interview room door was closed, but not locked, it can be concluded that defendant was being detained" and "[at] that time, a reasonable person, innocent of any crime, would have considered himself arrested"); *Halmon*, 225 Ill. App. 3d at 269-71 ("we [cannot] find it reasonable to believe that [defendant] consented to remain in a locked interrogation room while the police continued their investigation");

*People v. Walls* (1991), 220 Ill. App. 3d 564, 579, 581 N.E.2d 264 (it is "difficult to believe, as the State must necessarily contend, that citizens typically agree to spend extended periods of time at police stations, kept in small windowless rooms, waiting for the police to conduct their investigations and obtain probable cause for their arrest"); *Young*, 206 Ill. App. 3d at 801 ("[i]f mere questioning was the goal, he would not then have been ignored and left to spend the entire night in a small, windowless room, lacking in basic facilities, with the door closed"); *People v. Stofer* (1989), 180 Ill. App. 3d 158, 166-68, 534 N.E.2d 1287 (defendant was kept in an interrogation room, left alone for hours and was told that the police would "get back to him" while the police continued the investigatory process); *People v. Avery* (1989), 180 Ill. App. 3d 146, 152-54, 534 N.E.2d 1296 (same as *Stofer*).

Unlike the present case, in the recently decided *People v. Hill* (1995), 272 Ill. App. 3d 597, the officers testified that the defendant expressed a desire to stay overnight since he had been arrested in front of fellow gang members and an early release from the police station might serve as evidence that the defendant was cooperating with law enforcement officers.

Since we find that defendant was under arrest while locked in an interview room at the police station for six to seven hours, we next consider whether probable cause to arrest existed at that time to determine whether or not the arrest was legal.

Each party contends that the other party has waived the probable cause issue. The State contends that defendant waived the issue of whether the police had probable cause to arrest him when he was locked in the interview room because probable cause was not the subject matter of defendant's pretrial motion to quash arrest and suppress evidence. Defendant's motion, however, specifically alleges, in relevant part, as follows:

> "6. The conduct of petitioner prior to his arrest was such as would not reasonably be interpreted by the arresting officers as constituting probable cause that petitioner had committed or was about to commit a crime."

In light of this allegation, we find that defendant's motion sufficiently raised the probable cause issue at the trial level and preserved it for appellate review. *People v. Bates* (1991), 218 Ill. App. 3d 288, 293-94, 578 N.E.2d 240.

Defendant asserts that the State waived proving probable cause at the time of his arrest, *i.e.*, when defendant was locked in the interview room, because in the trial court the State relied on its contention that defendant was not under arrest until hours later at

10 p.m. in the evening. (*Franklin*, 115 Ill. 2d at 336-37.) In *Franklin*, the supreme court held that the State could not argue on appeal that the detention of the defendant was supported by probable cause because such argument directly conflicted with the no-arrest theory advanced by the State at the pretrial hearing. *Franklin*, 115 Ill. 2d at 336.

■ Even if the probable cause issue was deemed waived for review, the record clearly establishes that no probable cause to arrest existed at the time defendant was first locked in the interview room. Probable cause to arrest exists when the facts and circumstances known to the arresting officer are sufficient to warrant a man of reasonable caution in believing that an offense has been committed and that the person arrested has committed the offense. (*People v. Jones* (1993), 156 Ill. 2d 225, 237, 620 N.E.2d 325.) Probable cause to arrest is not established merely because a person lies or was last seen with the victim before the victim's death. *Reynolds*, 257 Ill. App. 3d at 802.

When he left defendant at the police station in a locked interview room, Detective Walsh had been told that defendant and the victim were together in the early morning hours of July 5 but had parted company as the sun was rising. The police also had a statement from Albert Green, who said he had seen the victim at a convenient store on July 5 about 10 or 11:30 a.m. There is no indication that the police had any physical or other evidence to link defendant to the crime and any discrepancies in defendant's initial statement were then unknown. The first plausible sign of the dissipation of defendant's story occurred when Ms. Cook called Detective Walsh about 6:15 a.m. on July 9 to refute defendant's presence at her apartment on July 5. In light of the scant information known to the police at midnight or 1 a.m. on July 9, we conclude that no probable cause to arrest existed when defendant was locked in the interview room overnight.

Our determination that defendant was subject to an illegal arrest does not resolve the question of whether defendant's confession should have been admitted. (*People v. Foskey* (1990), 136 Ill. 2d 66, 85, 554 N.E.2d 192.) A confession obtained after an illegal arrest may be admissible where it was obtained by means sufficiently distinguishable to be purged of the taint of the illegal arrest. (*People v. White* (1987), 117 Ill. 2d 194, 222, 512 N.E.2d 677, citing *Wong Sun v. United States* (1963), 371 U.S. 471, 487-88, 9 L. Ed. 2d 441, 455, 83 S. Ct. 407, 417.) To determine whether a confession was the product of the illegal arrest, the following factors are considered: (1) the proximity in time between the arrest and the confession, (2) the presence of intervening circumstances, (3) the purpose and flagrancy of the police misconduct, and (4) whether *Miranda* warnings were given. (*Foskey*,

136 Ill. 2d at 85-86, citing *Brown v. Illinois* (1975), 422 U.S. 590, 603-04, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261-62.) The prosecution bears the burden of demonstrating sufficient attenuation between the illegal arrest and the subsequent confession so that the confession can be rendered admissible. *Foskey*, 136 Ill. 2d at 86 (sufficient attenuation); *White*, 117 Ill. 2d at 222 (insufficient attenuation).

In the present case, the trial court conducted two pretrial hearings. First, on defendant's motion to quash arrest and suppress evidence, the trial court ruled that defendant was not under arrest until after he confessed and thus denied defendant's motion. Second, the trial court denied defendant's motion to suppress his confessions challenging the voluntariness of the statements. For attenuation purposes, however, voluntariness of a confession is not an issue. (*Reynolds*, 257 Ill. App. 3d at 805.) Given its ruling as to the time of arrest, the trial court did not address whether defendant's confession was sufficiently attenuated from the illegal arrest to purge the taint of the illegality.

■ Since the trial court was not presented with the attenuation issue, we remand this cause for a hearing to determine whether sufficient attenuation exists to warrant the admissibility of defendant's confession. See, *e.g.*, *Halmon*, 225 Ill. App. 3d at 276-77; *Bates*, 218 Ill. App. 3d at 297-98; *People v. Beamon* (1991), 213 Ill. App. 3d 410, 426-27, 572 N.E.2d 1011; *People v. Booker* (1991), 209 Ill. App. 3d 384, 394-95, 568 N.E.2d 211; *People v. Vega* (1990), 203 Ill. App. 3d 33, 44, 560 N.E.2d 983; *cf. People v. Crane* (1993), 244 Ill. App. 3d 721, 726, 614 N.E.2d 66.

If the trial court finds there was sufficient attenuation to purge the confession from the taint of the illegal arrest, we direct the trial court to reinstate the conviction in accordance with this opinion. On the other hand, if the trial court finds no such attenuation, we direct the trial court to suppress the confession and to conduct further proceedings consistent with this opinion. *Halmon*, 225 Ill. App. 3d at 277; *Bates*, 218 Ill. App. 3d at 298.

Defendant next asserts that during jury deliberations, the trial judge committed plain error by telling the jury that he could not respond to jurors' questions. We disagree.

The record establishes, and defendant in effect concedes, that defendant waived this issue by failing to object at trial and to include the issue in his post-trial motion. In fact, the record reveals that after the attorneys and the judge discussed the matter of jurors' questions, defense counsel specifically stated he had no objection to the response proposed by the judge.

■ Moreover, the record establishes and defendant concedes that defense counsel actively and affirmatively participated in crafting a response for the trial judge to give to the jury as a whole regarding the matter of questions from individual jurors. "Where a defendant acquiesces in the circuit court's answer to the jury's question, the defendant cannot later complain that the circuit court abused its discretion." *People v. Reid* (1990), 136 Ill. 2d 27, 38, 554 N.E.2d 174.

Furthermore, the plain error rule can only be invoked when the evidence is closely balanced or the error is of such magnitude that the commission thereof denies the accused a fair and impartial trial. (*People v. Young* (1989), 128 Ill. 2d 1, 46-47, 538 N.E.2d 453.) Neither criterion for the application of the plain error rule appears in the instant case.

Lastly, defendant asserts that his 55-year sentence constitutes a penalty for exercising his right to a jury trial and is excessive. Defendant argues that his sentence should be reduced because he had no prior convictions, he had been offered a term of 30 years prior to trial, the trial judge used the victim's death as an aggravating factor and substantial mitigating factors were present.

Regarding his argument that his sentence impermissibly represents a penalty for his decision to go to trial, defendant relies on a handwritten note which merely states "offer 30 yrs. IDOC good until 10/30/92." Defendant speculates that this note represents a plea negotiation in which he was offered a 30-year prison sentence in exchange for a guilty plea.

The record, however, affords no indication as to the note's author, origin or correlation to this case. The record further contains no reference to a plea negotiation and no knowledge on the part of the trial judge about such alleged negotiation. Absent any foundation in the record to support defendant's argument, this court cannot consider defendant's supposition. *People v. Edwards* (1978), 74 Ill. 2d 1, 7, 383 N.E.2d 944; *People v. Muzard* (1991), 210 Ill. App. 3d 200, 209, 569 N.E.2d 26.

Regarding defendant's argument based on the length of his sentence being excessive, Illinois law holds that a sentence which lies within the statutory limits should only be disturbed where the trial court abused its discretion. *E.g., People v. Major* (1993), 244 Ill. App. 3d 1013, 1021, 614 N.E.2d 241.

The sentence for a first degree murder conviction ranges between 20 and 60 years. (730 ILCS 5/5—8—1(a)(1)(a) (West 1992).) Natural life imprisonment may also be imposed by the trial court where "the court finds that the murder was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty or that any of the

aggravating factors" designated by statute are present. 730 ILCS 5/5—8—1(a)(1)(b) (West 1992).

In addition to the statutory sentencing range, a trial court may consider other relevant factors such as the nature and circumstances of the offense, defendant's history, character, rehabilitative potential, age, demeanor, mentality, habits and credibility. *E.g.*, *People v. King* (1993), 248 Ill. App. 3d 253, 281-82, 618 N.E.2d 709.

█ In light of these principles and our review of the record, we cannot find that the trial court abused its discretion in imposing a 55-year sentence.

For all the foregoing reasons, we reverse the trial court's order denying defendant's motion to quash arrest and remand the matter for a hearing to determine whether sufficient attenuation exists to purge the confession made by defendant from the taint of his illegal arrest.

Reversed and remanded with directions.

TULLY and CERDA, JJ., concur.