THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MELVIN CENTENO, Defendant-Appellant.

First District (3rd Division)   No. 1—99—1378

Opinion filed August 14, 2002.

Rita A. Fry, Public Defender, of Chicago (Ronald P. Alwin, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Manny Magence, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

Following a jury trial, defendant, Melvin Centeno, was found guilty of first-degree felony murder (720 ILCS 5/9—1(a)(3) (West 1994)) and armed robbery (720 ILCS 5/18—2 (West 1994)). While defendant was found eligible for the death penalty, the circuit court found the presence of sufficient mitigating factors to preclude imposition of that punishment and sentenced defendant to a term of natural life for murder and a concurrent term of 30 years' imprisonment for armed robbery.

On appeal, defendant argues: (1) the circuit court erred in denying his pretrial motions to quash arrest and suppress evidence; (2) the elicitation of testimony from the victim's wife concerning defendant's relationship with the victim's family, and the prosecutor's comments on the nature of that relationship during closing argument, operated to deny him a fair trial; (3) other argument engaged in by the prosecution during closing was highly inflammatory and rendered his trial unfair; (4) the circuit court erred in refusing to accept a proposed jury instruction concerning the use of prior inconsistent statements as substantive evidence; and (5) his sentence of natural life violates the constitutional principles set forth in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), or, alternatively, should be vacated as unduly excessive.

We agree with defendant that his motion to quash arrest should have been granted and, for the following reasons, reverse and remand for further proceedings.

## BACKGROUND

In December 1995, defendant was charged with, *inter alia*, first degree murder and armed robbery in connection with the November 15, 1995, shooting death of Marcus Osorio.

Prior to trial, defendant moved to quash his arrest and to suppress all evidence arising therefrom, including incriminating statements made to the authorities. Defendant further moved to suppress his statements on the ground they were the product of police misconduct and, hence, involuntary. Following a consolidated hearing, the circuit court denied defendant's motions and the case proceeded to trial in February 1996.

## The State's Case

The record establishes that defendant and the victim had become friends in 1989 and, in 1994, defendant moved in with the victim and his wife, Monica Osorio. The parties' living arrangement, however, was not conducive to their friendship and, according to Monica, the relationship between her husband and defendant waned during defendant's stay. Ultimately, defendant was asked to leave shortly before Christmas 1994.

By November 1995, defendant lived with his girlfriend, Elise De-Leon, in an apartment at 2954 West Belle Plaine in Chicago. In describing the nature of her relationship with defendant, Elise explained she bore the primary responsibility for the parties' financial obligations, paying the rent, utility, telephone, and grocery expenses. Elise received no money from defendant, save one occasion when defendant gave her $100, and never knew defendant to have received any form of paycheck.

Elise further testified that at some point during the first two weeks of November 1995, she observed defendant with a small caliber handgun, which he kept in a bedroom closet.

At all relevant times, the victim worked as a teller at a currency exchange located at the intersection of Lincoln, Belmont and Ashland Avenues in Chicago. The currency exchange, which could be accessed by way of doors located off either Lincoln or Belmont Avenue, opened to a general customer area. The customer area was separated by a steel cage that housed the teller station, where the business's currency and other valuables were secured. Access to the teller area could be achieved only through a single, locked entryway. Through this entryway, and just to the right of the teller's work station, was a doorway leading to the basement, where a bathroom was located.

On November 15, 1995, the victim arrived for work about 3 p.m. At the time, Lori Torres, the head cashier, was on duty. When Torres left about 7:40 p.m., the victim was the only person in the business.

At about 7:45 p.m. on November 15, Abayomi Olaleye was in the currency exchange. After completing his transactions, Olaleye left about 7:50 p.m. Olaleye testified the teller was the only person in the business when he left.

The victim's wife Monica testified she became concerned about her husband after he failed to return home after the business's normal closing time of 8 p.m. Monica called Greg Rosas, the currency exchange's manager, and asked Rosas to meet her at the business's location.

Upon her arrival, Monica did not see her husband's car parked in its usual spot. Monica, accompanied by her father, greeted Rosas and

the group entered the currency exchange through the Belmont door, which showed no signs of forced entry.

Rosas noticed the store's clock was stuck at the 7:57 position and eventually discovered that the circuit breakers had been switched off. Rosas entered the teller's cage, which like the Belmont Avenue door, exhibited no signs of forced entry. Inside the teller's cage, Rosas found the victim lying on the floor, dead. A subsequent medical examination determined the victim died as a result of a close-range gunshot wound to the right temple region.

Rosas inspected the teller's cage and noticed the store's safes were open and empty of its contents. The teller's drawers were also devoid of their paper currency. A subsequent examination by the business's owner disclosed that a total of $36,860 was missing.

On the night of the incident, Chicago police detective Ronald Yawger entered the business and inspected the teller's cage. According to Yawger, neither of the building's doors showed signs of forced entry. Yawger also observed no signs of forced entry to the teller's cage door. Yawger recovered a spent .25-caliber shell casing approximately five feet from where the victim was discovered.

Upon speaking with Monica, Detective Yawger learned that the victim's overgarment, a hooded Chicago Bears jacket, was missing, as was the victim's vehicle. Yawger further became aware of defendant, who, according to Yawger, was considered a possible suspect. Yawger obtained a photograph of defendant and immediate efforts were made by officers to ascertain defendant's whereabouts.

### Defendant's Activities on November 15, 1995, and During the Proceeding Weeks

Elise testified that at about 9 p.m. on November 15, 1995, defendant called and told her he would be home shortly. At about 9:30 p.m., defendant showed up at the apartment of Raul DeLeon, one of Elise's brothers, with two six-packs of beer. Elise's other brother, Melvin DeLeon, was also at the apartment.

After drinking beer for about a half-hour, defendant and Melvin went to Elise's apartment. Elise was home at the time and the group shared some drinks and food in the kitchen. When Melvin exited the kitchen a short time later, he saw defendant sitting in the bedroom counting a large bundle of money.

Elise, upon observing the money, confronted defendant. After Elise's persistent inquiries, defendant stated he got the money from a drug transaction.

The following morning, defendant paid for a taxi to take Elise to work and then proceeded to the airport, where he paid $700 in cash

for two airline tickets for a November 17, 1995, flight to Puerto Rico. Defendant used additional cash later that day to purchase $3,100 in furniture and $850 worth of gym shoes and clothing at the Brickyard shopping mall.

On the morning of November 17, 1995, defendant and Elise caught a 7 a.m. flight to Puerto Rico. Upon their arrival, defendant paid cash for a rental car, and he and Elise went to a Marriot hotel, where they stayed for about two weeks. Defendant paid the hotel an initial cash deposit of $500 and an additional $1,500 cash to settle the cost of the couple's stay. During the trip, defendant made several cash purchases for various items, including clothing, jewelry and shoes.

### Defendant's Return to Chicago and Time at the Area Three Police Station

Detective Greg Pittatsis eventually learned defendant and Elise would be returning to Chicago on the morning of December 3, 1995. At about 10:45 a.m. that day, Pittatsis, accompanied by Detective Lawrence Aikin and Sergeant Kajari, met defendant and Elise at O'Hare airport. Pittatsis asked defendant and Elise if they would accompany the officers to the Area 3 police station, and defendant and Elise agreed. According to Pittatsis, defendant's presence was requested at the station so defendant could be questioned regarding the November 15 crimes.

Aikin and Kajari transported defendant, unhandcuffed, to the Area 3 police station, while Pittatsis and Elise remained at the airport to await the parties' luggage. Aikin stated he, Kajari and defendant arrived about 11 a.m., at which time defendant was placed in 10- by 12-foot, windowless interview room, located in the station's detective area. According to the testifying officers, defendant was not handcuffed in the interview room, which remained unlocked at all times, prior to his formal arrest.

Detective Pittatsis and Elise eventually arrived at Area 3 about 1:30 p.m. At about 2:30 p.m., defendant was interviewed by Pittatsis, Aikin and Detective John Turney. Before initiating discussions, Turney advised defendant of his *Miranda* rights and defendant agreed to talk. The detectives questioned defendant for about 45 minutes, during which defendant denied any involvement in the incident. At about 3:15 p.m., the detectives left and continued with their investigation. Defendant, meanwhile, remained in the interview room.

After speaking with defendant, the detectives met with Elise, who was in an interview room separate from defendant. According to Detective Pittatsis, these talks with Elise spanned the course of several hours and revealed information regarding: the nature of Elise's

relationship with defendant, particularly the fact defendant was not known to have money; defendant's possession of a small handgun a few weeks before the murder; defendant's custody of a bundle of cash the night of November 15; and the various cash expenditures made by defendant at the Brickyard Mall and while in Puerto Rico. The detectives' investigation, which also included interviews with Elise's brothers, further uncovered that defendant had known the victim, had been seen in the currency exchange prior to the shooting, and, on one of those occasions, had asked a store employee to use the bathroom facilities.

The information gleaned from their investigation prompted the detectives to search the parties' luggage, as well as leave the police station and search Elise's apartment for the gun that had been seen in defendant's possession. When their search of the apartment proved unfruitful, the detectives returned to the station about 11 p.m., at which time Detectives Aikin and Turney questioned defendant a second time.

Turney again advised defendant of his *Miranda* rights and defendant agreed to talk. Despite being confronted with facts learned by the detectives during the investigation, defendant persisted in denying any involvement in the crimes, and the detectives concluded their questioning about 11:30 p.m.

Detective Pittatsis also spoke with defendant a second time shortly after midnight on December 4. Pittatsis advised defendant of his rights and defendant agreed to talk. Like the other detectives, Pittatsis confronted defendant with the facts learned during the investigation. Pittatsis testified that when he asked defendant how he could have killed his friend, defendant broke down, admitting his involvement. After confessing, defendant was placed under formal arrest about 1 a.m. December 4.

### Defendant's Stay in the Interview Room and Treatment by the Detectives

As the detectives continued investigating the case, defendant remained in the interview room. From the time his initial conversation with detectives concluded about 3:15 p.m., until the time he was questioned by Detectives Aikin and Turney at 11 p.m., defendant was not interviewed about the incident. The detectives, who admitted they did not question defendant about the crimes during the foregoing time frame, stated they periodically checked on defendant, bringing him food and drink from the station's lockup area and allowing him to use the washroom facilities.

Detective Pittatsis explained the area of the police station in which

defendant was located is restricted to police personnel. If defendant had attempted to leave, Pittatsis stated defendant may have been stopped, particularly since he was not a police officer. Defendant never asked to leave the station and, according to Pittatsis, was free to leave at any time if he so desired. Defendant, however, was never advised by Pittatsis or any other officer that he was free to go if he wished.

Detectives Pittatsis, Aikin and Turney each denied, during the pretrial hearings and at trial, ever physically abusing or threatening defendant prior to his formal arrest. Pittatsis never saw any other officer physically strike or otherwise abuse defendant, and further never observed any physical injuries to defendant's person. According to the detectives, defendant was treated civilly at all times.

Assistant State's Attorney Lawrence O'Reilly arrived at Area 3 about 1:45 a.m. on December 4. After discussions with detectives, Elise and her brother Melvin, O'Reilly, together with Detective Pittatsis, met with defendant and the parties discussed defendant's involvement in the crimes.

O'Reilly met with defendant again about 7:45 a.m., this time by himself. Defendant related he had been given food, drink, and access to the bathroom. Defendant further assured O'Reilly he had been treated appropriately and that the police had acted in a professional manner.

O'Reilly asked defendant if he would be willing to reduce what he had related during the parties' initial meeting to a written statement. Defendant agreed and O'Reilly prepared a written summary of defendant's confession. At its completion, the statement was reviewed with defendant so defendant could make any desired changes. According to O'Reilly, defendant signed each page prepared and made several corrections, which he initialed.

The written statement, which was published to the jury and in which defendant acknowledges his cooperation to have been free and voluntary, related that on October 29, 1995, defendant was walking near the intersection of Montrose and Damen Avenues in Chicago when he found a small, silver .25-caliber handgun. Defendant retrieved the gun, keeping the weapon "with him every day from that day on." In early November 1995, defendant showed the gun he found to Elise.

On the day of the murder, defendant went to Metanky Realty, where he cleaned the premises until about 7:30 p.m. While being driven home by his boss, defendant noticed the car of the victim, whom defendant had become friends with in 1991, outside the currency exchange.

After being dropped off, defendant, who had been to the currency exchange a number of times before, entered the business and asked

the victim to use the bathroom. The victim opened the teller's cage door and directed defendant, who was carrying the gun, to the basement.

Upon returning from the bathroom, defendant noticed the victim watching a basketball game on television. Defendant also observed a large amount of money lying on the teller counter. Sensing the victim was distracted, defendant began stuffing the money into his jacket. The victim eventually caught wind of the situation and confronted defendant. As defendant backed away in an attempt to leave, the victim grabbed defendant. Defendant displayed the gun from his pocket and pointed it at the victim, hoping the victim would back off. The victim, instead, reached at defendant, prompting defendant to fire the gun.

After shooting the victim, defendant grabbed the remaining cash on the teller counter as well as some currency located in the business's safe. Defendant took the victim's Bears jacket and placed the hood over his head to conceal his identity. Defendant exited the building, got in the victim's vehicle and drove north on Ashland Avenue, disposing of the gun near a Burger King restaurant and eventually abandoning the vehicle.

Over the course of the proceeding two weeks, defendant used the money from the currency exchange for a number of cash purchases, including furniture, the items at the Brickyard Mall, and the trip to Puerto Rico.

During his discussions with defendant, Assistant State's Attorney O'Reilly observed no blood on either defendant's person or clothing, and did not notice any manifestations of physical injury, such as swelling, scratches or cuts, to defendant's face or body.

O'Reilly maintained he made no threats or promises to defendant in exchange for the statement and that defendant's cooperation in detailing his involvement in the crimes was free and voluntary.

### The Defense

Throughout the pretrial and trial proceedings, defendant attempted to paint a picture of a police investigation bent on misconduct, coercion and physical abuse. At the pretrial hearing, defendant testified that after voluntarily accompanying the officers to the Area 3 station, he was handcuffed and placed in a locked interview room. Defendant additionally claimed he was not given food or drink, and was denied use of the bathroom on occasion, prior to his confession to Detective Pittatsis.

About two hours after being locked in the interview room, defendant was confronted by the detectives, punched in the chest and

told he needed to provide some information regarding the victim's murder. Defendant disclaimed any knowledge of the crimes, and the detectives left, only to return periodically throughout the course of the day to allegedly beat and threaten defendant until defendant finally admitted his involvement. While defendant asserted he had been the victim of physical abuse by the detectives, defendant's claims were general and vague and did not detail with any specificity the nature of the mistreatment.

At trial, defendant testified he had planned to travel with Elise to Puerto Rico well before November 15, 1995. While he did not hold any credit cards, defendant maintained he had sufficient money, secured through an early-November 1995 drug transaction, to pay for the trip. According to defendant, he went to an area bar on November 15, 1995, and received $12,000 by the bar owner for his participation.

Defendant testified that when he and Elise returned to Chicago on December 3, 1995, they were met by three Chicago police officers. After voluntarily accompanying the officers to the police station, defendant was placed in an interview room and handcuffed to the wall. The detectives then left the room.

Approximately two to three hours later, defendant was confronted by Detectives Pittatsis, Turney and Aikin. Defendant was advised that he was at the police station in connection with the victim's murder and that the detectives needed some information regarding a gun. Defendant told the detectives he had no knowledge of the victim's killing. Turney and Aikin, without provocation, then hit defendant in the chest and face.

Defendant testified such physical abuse by the detectives continued intermittently whenever he denied any knowledge of the crimes. Defendant specifically related each instance of mistreatment, including an occasion when his sweatshirt was pulled over his head and he was repeatedly hit with a telephone directory in the head, neck and lower back. According to defendant, the attack caused him to bleed a "whole lot" from his mouth or nose and onto his sweatshirt.

At a point over the course of the beatings, Detective Pittatsis handed defendant a pen and paper and instructed defendant to write out what defendant described as "preposterous things that supposedly [he] did" the day of the murder. Pittatsis told defendant "this is what I'm going to read to you" and "what you got to say because if you don't say these things the way I'm telling you, you won't leave this place alive." Because the detectives' threats terrified him and made him fear for his life, defendant agreed to say whatever Pittatsis wanted.

Defendant was taken to the bathroom, where he was directed by

Detective Aikin to "clean [himself] up," and then to meet with Assistant State's Attorney O'Reilly. Defendant maintained he apprised O'Reilly about the detectives' mistreatment but that O'Reilly simply ignored him. As defendant told O'Reilly about his involvement in the murder, as concocted by Pittatsis, Pittatsis periodically interjected to change the information being provided. According to defendant, Pittatsis amended the statement to reflect what Pittatsis wanted said. While defendant admitted initialing these amendments, defendant maintained he was directed to do so by Pittatsis and O'Reilly. Defendant further explained he signed the statement because he "had no choice" under the circumstances.

Defendant acknowledged he called and visited the victim at the currency exchange several times prior to the victim's murder and expressly indicated he was at the business two days before the incident. Defendant, however, maintained he never went to the currency exchange on November 15, 1995, and specifically denied any involvement in the robbery and shooting of the victim.

Defendant tendered Mark Boese, a forensic criminalist, and Dr. Pravatchai Wang Boonlayangoor, an expert in DNA and RNA analysis, to establish that the sweatshirt he had been wearing on December 3 contained droplets of his blood. Upon testing some stains extracted from the sweatshirt, Boese determined the samples tested positive for the presence of hemoglobin, a component of bodily tissues and fluids, including blood. While Boese reported that the specimens were most likely positive for blood, Boese acknowledged the specimens could represent saliva or some other bodily fluid. Even if the specimens were blood, Boese stated he was not able to determine when the blood would have stained defendant's garment.

Dr. Boonlayangoor testified he examined defendant's sweatshirt, as well as samples of defendant's blood, to determine any DNA match. Dr. Boonlayangoor took a number of swatches from the sweatshirt and observed off-white stains that could have come from any bodily fluid. The doctor explained blood would be depicted by stains dark brown in color and not appear off-white. The stains were never tested to determine the presence of blood and their age could not be ascertained.

As to one swatch, Dr. Boonlayangoor testified the specimen probably matched defendant, but explained the specimen had an insufficient number of genetic markers to positively identify defendant as the source. The composition of other swatches, according to the doctor, was consistent with defendant's genetic markers. Dr. Boonlayangoor estimated the results of his testing were 98% accurate.

Following deliberations, the jury found defendant guilty of first-degree murder and armed robbery. At sentencing, the circuit court

found defendant eligible for death but, due to the existence of sufficient mitigating factors, imposed a term of natural life in prison for murder, as well as a concurrent term of 30 years' imprisonment for armed robbery.

## ANALYSIS

### I

Defendant initially challenges the circuit court's denial of his pretrial motion to quash arrest. Defendant maintains while he voluntarily accompanied investigating officers to Area 3 to answer questions concerning the victim's murder, his presence at the station evolved into an illegal detainment in violation of his constitutional rights (U.S. Const., amends. IV, XIV).

■ We initially dismiss the State's claim that this point has been waived by defendant's failure to adequately raise this error in his posttrial motion. Defendant's motion specifically sets forth the basis for the court's purported error and, as such, is sufficient to preserve the issue for our review. In any event, to the extent defendant's posttrial allegations are deemed inadequate, the constitutional dimension of defendant's claim trumps the State's assertion of waiver. *People v. Cox*, 295 Ill. App. 3d 666, 670, 693 N.E.2d 483, 485 (1998); *People v. Follins*, 196 Ill. App. 3d 680, 692, 554 N.E.2d 345, 353 (1990).

■ Turning to the merits of defendant's challenge, we first discuss the applicable standard of review. Ordinarily, the question of whether a person has been illegally seized for purpose of fourth amendment analysis represents a mixed question of fact and law. *People v. Wallace*, 299 Ill. App. 3d 9, 16, 701 N.E.2d 87, 93 (1998); *People v. Eyler*, 132 Ill. App. 3d 792, 798, 477 N.E.2d 774, 779 (1985). The factual circumstances of the defendant's alleged seizure must initially be ascertained from the record, which may involve the weighing of evidence, assessment of witness credibility, and resolution of conflicts in the witnesses' testimony. It must then be determined whether, as a matter of law, those factual findings support a conclusion that the defendant was seized in violation of his constitutional rights.

While a reviewing court, when presented with review of issues involving mixed questions of fact and law, must afford deference to the circuit court's factual findings, the court "remains free to engage in its own assessment of the facts in relation to the issues presented and may draw its own conclusions when deciding what relief should be granted." *People v. Crane*, 195 Ill. 2d 42, 51, 743 N.E.2d 555, 562 (2001). Accordingly, while the court's factual determinations made in connection with a motion to quash an arrest as an illegal seizure must be accorded great deference and will be disturbed only if they are

against the manifest weight of the evidence, the court's ultimate determination regarding whether a fourth amendment seizure occurred in light of the facts is a legal matter to be reviewed *de novo*. *Brown v. City of Oneonta*, 221 F.3d 329, 340 (2d Cir. 1999); *United States v. Galvan-Muro*, 141 F.3d 904, 906 (8th Cir. 1998); see also *Ornelas v. United States*, 517 U.S. 690, 699, 134 L. Ed. 2d 911, 920, 116 S. Ct. 1657, 1663 (1996) (applying two-prong approach in reviewing trial court's ruling on motion to suppress involving the legal issues of probable cause and reasonable suspicions); *People v. Sorenson*, 196 Ill. 2d 425, 431, 752 N.E.2d 1078, 1083 (2001) (following *Ornelas* and applying same); *In re G.O.*, 191 Ill. 2d 37, 49-50, 727 N.E.2d 1003, 1009-10 (2000) (following *Ornelas* and applying two-prong approach in reviewing trial court ruling on motion to suppress involving legal issue of voluntariness of confession).

Defendant in the present matter, however, does not challenge the circuit court's factual findings. Rather, defendant, relying on the undisputed facts in the record, attacks the court's ruling that he was not arrested prior to his formal detainment. Since defendant mounts only a legal challenge to the court's decision, we examine the undisputed evidence *de novo* to determine whether the facts establish an unlawful seizure.[1] See *Wallace*, 299 Ill. App. 3d at 16, 701 N.E.2d at 93.

■ The fourth amendment protects individuals from unreasonable searches and seizures. U.S. Const., amend. IV. A seizure, for fourth amendment purposes, is synonymous with an arrest, and an arrest effectuated without probable cause, or a warrant based thereon, violates an accused's constitutional rights. *People v. Williams*, 164 Ill. 2d 1, 11, 645 N.E.2d 844, 848 (1994). An arrest occurs when a person's freedom of movement has been restrained by means of physical force or by a show of authority (*Williams*, 164 Ill. 2d at 11, 645 N.E.2d at 848) and is gauged by whether, in view of all surrounding circumstances, a reasonable person, innocent of any wrongdoing, would have believed himself not free to leave. *Michigan v. Chesternut*, 486 U.S. 567, 573, 100 L. Ed. 2d 565, 572, 108 S. Ct. 1975, 1979 (1988); *Williams*, 164 Ill. 2d at 11, 645 N.E.2d at 848.

■ Detention of a person by the police for custodial interrogation, absent probable cause and irrespective of whether the technical trappings of a formal arrest exists, intrudes so severely on the interests

---

[1]While the factual statement, for sake of clarity, is derived from the evidence presented at both defendant's trial and the pretrial hearing on defendant's motions, only the latter presented evidence will be considered in resolving this issue.

protected by the fourth amendment that the traditional safeguards against illegal arrest are triggered. *People v. Wicks*, 236 Ill. App. 3d 97, 104, 603 N.E.2d 594, 598 (1992); *People v. Gordon*, 198 Ill. App. 3d 791, 796, 556 N.E.2d 573, 576 (1990). In determining whether a person was illegally detained, the coercive conduct of the police as a whole is considered (*People v. Bass*, 257 Ill. App. 3d 893, 898, 629 N.E.2d 592, 596 (1994)), and a number of factors, not one being dispositive, are examined including: (1) the time, place, length, mood and mode of the police interrogation; (2) the placement of the defendant at the police station; (3) the number of police officers present; (4) any indicia of formal arrest or physical restraint; (5) the intent, knowledge, and investigative focus of the officers; and (6) statements and nonverbal conduct of the police relating to defendant's freedom to leave. *People v. Ball*, 322 Ill. App. 3d 521, 537, 750 N.E.2d 719, 732 (2001); *People v. Williams*, 303 Ill. App. 3d 33, 40, 707 N.E.2d 679, 684 (1999); *People v. Prince*, 288 Ill. App. 3d 265, 273, 681 N.E.2d 521, 527 (1997).

■ The police undoubtedly considered defendant the primary, if not sole, suspect shortly after commission of the crimes. Indeed, Detective Pittatsis acknowledged the purpose of meeting defendant at the airport on December 3 and requesting his presence at the police station was to question defendant about the incident.

The events preceding defendant's arrival at the Area 3 station strongly suggest defendant was brought there for investigatory purposes. After defendant denied any knowledge of or involvement in the crimes after a 45-minute conversation, the detectives never told defendant he was free to leave. Certainly, the detectives' stated purpose of having defendant accompany them to the police station was achieved when defendant denied any knowledge of the crimes and failed to provide any information that would have implicated himself. Rather than advising defendant he could leave or come back later, the detectives let defendant sit in the small, windowless interview room for an extended period of time. Defendant, in fact, remained in the interview room for over 7 1/2 hours without being questioned about the crimes. See *People v. Young*, 206 Ill. App. 3d 789, 800, 564 N.E.2d 1254, 1262-63 (1990). While Detective Pittatsis testified defendant could have left if he desired, Pittatsis' subjective belief bears no relevance where that option was never communicated to defendant. See *People v. Sneed*, 274 Ill. App. 3d 274, 283, 653 N.E.2d 1340, 1346 (1995); *People v. Marts*, 266 Ill. App. 3d 531, 538, 639 N.E.2d 1360, 1365-66 (1994). Pittatsis' undisclosed belief, coupled with the location of the interview room being in the area of the station where the detectives worked, permits a reasonable belief that defendant was not able to move about freely.

It was not until 11 p.m., almost 8 hours after defendant first denied any knowledge of the crimes and 10 hours after his arrival at the Area 3 station, that defendant was finally questioned again by detectives. Before questioning, defendant was advised of his *Miranda* rights, a fact commonly recognized as an indicia of an arrest. *People v. Barlow*, 273 Ill. App. 3d 943, 949, 654 N.E.2d 223, 229 (1995); *People v. Graham*, 214 Ill. App. 3d 798, 809, 573 N.E.2d 1346, 1353 (1991). Despite his persistent denials, defendant was kept in the interview room until he was questioned, and readvised of his rights, by Detective Pittatsis shortly after midnight on December 4, eventually incriminating himself and supplying probable cause for his arrest.

The record exhibits that defendant's detainment had a "quality of purposefulness" about it in that the detectives' interrogations of defendant were conducted in hopes of obtaining sufficient information upon which to predicate probable cause for an arrest. *People v. Townes*, 91 Ill. 2d 32, 37-38, 435 N.E.2d 103, 105 (1982). The police investigation of the crimes immediately gravitated toward defendant and defendant was considered a prime suspect when he was approached by the officers at the airport. After initially disclaiming any knowledge or involvement, defendant remained in an interview room for nearly eight hours, while the detectives continued with their investigation, interviewing witnesses, searching defendant's luggage, and taking a trip to the Belle Plaine apartment in an attempt to find defendant's handgun. Clearly, the detectives' investigation was aimed at mustering up evidence that could be used to confront defendant, who was readily accessible in a station house interview room, and compel a confession.

While we recognize that not all interrogations conducted at the police station are *per se* custodial (see *Prince*, 288 Ill. App. 3d at 273, 681 N.E.2d at 527), this court has "continually rejected the proposed fiction that a person who voluntarily agrees to submit to interrogation at a police station also implicitly consents to remain in the police station while the police investigate the crime to obtain probable cause for the interviewee's arrest." *Barlow*, 273 Ill. App. 3d at 950, 654 N.E.2d at 229. The fourth amendment strictly condemns the types of police expeditions for evidence undertaken by the detectives in this case. *People v. Franklin*, 115 Ill. 2d 328, 335, 504 N.E.2d 80, 83 (1987). Based on the undisputed record, we conclude defendant was illegally seized in violation of his constitutional rights.[2]

■ Our determination that defendant was illegally seized does not

---

[2]While not posited in its appellate brief, the State asserted at oral argument that the police had sufficient probable cause to effectuate defendant's arrest prior to his confession to Detective Pittatsis. During the pretrial

resolve the question of whether defendant's subsequent confession was admissible at trial. The illegal seizure of a person does not automatically render a subsequent confession inadmissible. *People v. Murray*, 312 Ill. App. 3d 685, 690, 728 N.E.2d 512, 516 (2000). The admission of a confession will be upheld where it is shown that the defendant's statement was not obtained by the exploitation of the illegal arrest but, conversely, was the product of the defendant's free will. *People v. Jennings*, 296 Ill. App. 3d 761, 763-64, 695 N.E.2d 1303, 1305 (1998).

Before discussing the issue of attenuation, however, we must necessarily consider defendant's claim the circuit court erred in finding that his confession was voluntary. If defendant's statement was not voluntarily given, then the question of whether that statement was sufficiently attenuated from the taint of defendant's unlawful seizure need not be considered.

■ Review of a ruling on a motion to suppress a confession as involuntary, like a ruling on a motion to quash, ordinarily involves a two-step approach. The circuit court's findings of fact and determinations of witness credibility are accorded great deference and, accordingly, will not be disturbed unless they are against the manifest weight of the evidence. *G.O.*, 191 Ill. 2d at 50, 727 N.E.2d at 1010. The court's ultimate finding of voluntariness, being a legal determination, is not entitled to such deference and is reviewed *de novo*. *G.O.*, 191 Ill. 2d at 50, 727 N.E.2d at 1010. While strictly *de novo* review is appropriate in those cases where neither the facts nor credibility of the witnesses was at issue, appellate review proceeds under the two-step approach where, like here, the credibility of the witnesses was very much at issue. *People v. McDaniel*, 326 Ill. App. 3d 771, 780, 762 N.E.2d 1086, 1093 (2001).

■ A defendant's confession is admissible where the totality of circumstances establishes that the incriminating statement was made freely and without compulsion or inducement of any sort. *G.O.*, 191 Ill. 2d at 54, 727 N.E.2d at 1012; *People v. Gilliam*, 172 Ill. 2d 484, 501, 670 N.E.2d 606, 614 (1996). As defendant recognizes, the question of whether his confession was voluntary turned principally on the

proceedings, the State never asserted probable cause in response to defendant's motion to quash. Rather, the State simply claimed no illegal seizure had occurred. The general rule that a prevailing party may raise, in support of a judgment, any reason appearing in the record does not apply when the new theory advanced is inconsistent with the position adopted below. *People v. Franklin*, 115 Ill. 2d 328, 336, 504 N.E.2d 80, 83 (1987). Because the State's probable cause argument is directly at odds with its position taken at the pretrial hearing, it will not be considered on appeal.

credibility of the witnesses who testified at the suppression hearing. Defendant testified to general and broad assertions of misconduct on the part of the detectives, while the detectives steadfastly denied ever engaging in mistreatment toward defendant.

■ The law is well settled that credibility determinations regarding the voluntariness of a statement are best determined by the circuit court (*Gilliam*, 172 Ill. 2d at 505, 670 N.E.2d at 616), which is in the best position to assess the evidence, weigh the testimony given and resolve any evidentiary conflicts. *People v. Brown*, 327 Ill. App. 3d 816, 822, 764 N.E.2d 562, 568 (2002); *Wicks*, 236 Ill. App. 3d at 107, 603 N.E.2d at 600. It was within the circuit court's province to give more credence to the detectives' testimony than the claims of defendant and we are in no position on appeal to second-guess that decision.

•■ While fairly characterizing the suppression hearing as a "swearing contest," defendant urges this court to consider his testimony at trial detailing the nature of the detectives' physical abuse, as well as the forensic evidence presented through the testimonies of Boese and Dr. Boonlayangoor. While a reviewing court can consider evidence introduced at trial in addition to the evidence presented at the suppression hearing, that principle applies only where the reviewing court upholds the circuit court's decision refusing to suppress a defendant's confession. The analysis is different when a defendant is seeking to overturn the circuit court's ruling based on later-adduced trial evidence. *People v. Brooks*, 187 Ill. 2d 91, 127, 718 N.E.2d 88, 108-09 (1999). The defendant in such instances can rely on trial evidence only if he renewed his suppression motion at trial and requested the circuit court to reconsider its earlier ruling. *Brooks*, 187 Ill. 2d at 127-28, 718 N.E.2d at 109; *People v. Mendez*, 322 Ill. App. 3d 103, 112, 749 N.E.2d 391, 399 (2001).

■ In the present case, defendant neither renewed his motion nor asked for the court's reconsideration upon the presentation of his testimony and the forensic evidence. Consequently, defendant cannot rely on that evidence in seeking reversal of the circuit court's suppression ruling. The court's earlier ruling was not final and was subject to modification (*Brooks*, 187 Ill. 2d at 127, 718 N.E.2d at 109) and by having the motion renewed and reconsideration requested, the court would have been afforded the opportunity to examine its earlier determination in light of the evidence that defendant relies upon here. Defendant renewing his motion was particularly imperative in this case where his trial testimony differed significantly from the testimony he gave at the pretrial hearing. Upon review of the record, we find defendant's confession was properly found to have been voluntary.

In light of its ruling on defendant's motion to quash, the circuit

court had no occasion to consider the issue of attenuation. Remand for an attenuation hearing to determine the admissibility of defendant's confession is appropriate here because the record is insufficient to allow an independent ruling of the matter. *Wallace*, 299 Ill. App. 3d at 19, 701 N.E.2d at 94. Accordingly, we reverse defendant's convictions and remand the cause for a hearing on whether defendant's confession was sufficiently attenuated from the taint of his illegal arrest to warrant its admissibility. *Wallace*, 299 Ill. App. 3d at 19, 701 N.E.2d at 94; *Barlow*, 273 Ill. App. 3d at 953, 654 N.E.2d at 231; *Young*, 206 Ill. App. 3d at 803-04, 564 N.E.2d at 1264-65. Since the circuit court may conclude on remand that defendant's confession was not obtained by exploitation of his illegal arrest and, therefore, was admissible at trial, we will address whether defendant's other contentions of reversible error contain merit.

## II

The text in this section and the remaining sections is nonpublishable pursuant to Supreme Court Rule 23.

## CONCLUSION

For the foregoing reasons, defendant's judgments of conviction and sentence are vacated and the cause is remanded for further proceedings consistent with this opinion. Should the circuit court find defendant's confession sufficiently attenuated, the court is directed to reinstate defendant's convictions and sentences. If, on the other hand, defendant's confession is found to have been exploited from his illegal detention so as to render the confession inadmissible, the court is ordered to suppress defendant's statements and conduct further proceedings consistent with our opinion. To quell any double jeopardy concerns, we consider the sufficiency of the State's evidence and, upon review of the record, including defendant's admissions (see *People v. Olivera*, 164 Ill. 2d 382, 393, 647 N.E.2d 926, 931 (1995) (all evidence, including that evidence declared inadmissible, may be considered in determining whether retrial is barred by double jeopardy), we find sufficient evidence for a rational trier of fact to have found defendant guilty of the charged offenses beyond a reasonable doubt.

Reversed; remanded with directions.

HALL, P.J., and SOUTH, J., concur.