NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 250640-U

NO. 4-25-0640

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 18, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Henry County |
| DENZEL DAVENPORT, | ) | No. 15CF33 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Terence M. Patton, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices DeArmond and Grischow concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The appellate court affirmed, holding the trial court did not err by dismissing defendant's postconviction petition at the second stage of postconviction proceedings because defendant failed to make a substantial showing of a claim of ineffective assistance of appellate counsel.

¶ 2    Defendant, Denzel Davenport, appeals the dismissal of his postconviction petition at the second stage of postconviction proceedings. Specifically, defendant argues he made a substantial showing of a claim that his counsel on direct appeal was ineffective for failing to raise the preserved issue that the trial court erred by denying his motion to suppress on the basis that his confession was involuntary. We affirm.

¶ 3                        I. BACKGROUND

¶ 4    In February 2015, the State charged defendant with two counts of attempted first degree murder (720 ILCS 5/8-4, 9-1(a)(1) (West 2014)), home invasion (*id.* § 19-6(a)(2)), armed

robbery (*id.* § 18-2(a)(1)), residential burglary (*id.* § 19-3(a)), two counts of aggravated battery (*id.* § 12-3.05(a)(1), (d)(1)), and theft (*id.* § 16-1(a)(1)). The charges stemmed from an incident during which an elderly man, John Eyman, was stabbed multiple times in his home. Defendant was originally charged as a juvenile in November 2014, but the matter was transferred to adult criminal court pursuant to the automatic transfer provision of the Juvenile Court Act (see 705 ILCS 405/5-805(1)(c) (West 2014)).

¶ 5                                    A. Motion to Suppress

¶ 6        Defendant filed a motion to suppress statements he made to law enforcement officers on the basis they were not made voluntarily, were coerced, and were false. The motion alleged that defendant initially denied involvement in the incident and made admissions to police officers only after his mother instructed him to do so. The motion further alleged that defendant's mother was a "proxy" for the State.

¶ 7        At the hearing on the motion to suppress, Detective Michael Minx of the Kewanee Police Department testified that on November 23, 2014, defendant and A.S. were in custody in connection with a retail theft. Defendant was 17 years old, and A.S. was 14 years old. They also fit the description of individuals involved in a stabbing that occurred two days earlier. Minx interviewed A.S., and he made admissions concerning the retail theft.

¶ 8        Minx testified that he then interviewed defendant. Deputy Chad Winter was present as a juvenile officer during the interview because defendant's mother could not drive to the police station due to a foot injury. Minx stated he did not use physical force, threaten defendant, or make promises of leniency. During the interview, defendant made admissions concerning the retail theft, but he denied involvement in the stabbing.

¶ 9        Minx stated he then interviewed A.S. a second time for approximately 30 to 45

minutes. During this interview, A.S. implicated himself and defendant in Eyman's stabbing. After the interview, an officer picked up defendant's mother and drove her to the police station because Minx believed it was important for her to be there. Defendant's mother arrived at the police station, and the officers allowed her to speak to defendant privately.

¶ 10        Approximately 20 to 30 minutes after the second interview with A.S., Minx interviewed defendant a second time in the presence of his mother and Winter. Minx read defendant his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) again and began asking him questions. After a short time, Minx left the room because he believed defendant was giving untruthful answers. A few minutes later, defendant's mother exited the interview room and said, "I think I'm going to get a lawyer for my son." Minx asked her if she wanted to see a picture of the victim. Minx explained:

> "I wanted her to see what her son was capable of and how bad the victim had been stabbed and his face had been sliced open. I wanted her to see that this wasn't a juvenile thing, this was a serious crime that had been committed, and I wanted her to fully know what the aspects of this case was."

¶ 11        Defendant's mother initially said she did not want to see a photograph of the victim. She then changed her mind and said she wanted to see one. After she saw a picture of the victim, she walked back into the interview room and began speaking sternly to defendant. Minx was unsure whether he should give them privacy, and he stood in the open doorway of the interview room. After a few moments, he asked defendant's mother if she wanted privacy. She replied that she did not and that defendant was ready to give his statement. Minx reentered the room, and defendant began confessing almost immediately.

¶ 12        Minx stated he did not ask defendant's mother to elicit a confession from him

when he showed her the picture. Minx indicated he had interviewed defendant in the past. The State asked: "Is he someone who, in the past, has chosen to confess if he chose to and not if he didn't?" Minx replied, "Correct." Referring to past interviews, defense counsel asked Minx: "Had you went and got his mother at any of those interviews to get information?" Minx said, "Yes." Defense counsel then asked: "So you knew *** if she came in, he'd open up and talk to you further." Minx replied, "No. I got his mother because she was his parent, and she needed to be there for the interviews."

¶ 13　　　　The trial court admitted into evidence recordings of defendant's two interviews and A.S.'s two interviews with law enforcement officers. Defendant's first interview lasted approximately 30 minutes. Minx read defendant his *Miranda* rights at the beginning of the interview. Defendant denied any involvement in the incident and stated that he had heard that A.S. and an individual named Zach had been involved. During this interview, Minx asked defendant if he had recently been released "from a mental institute or something." Defendant said he had spent approximately two weeks in the facility "for suicide," and he had been released approximately one week prior to the interview.

¶ 14　　　　At the beginning of the second interview, defendant was sitting in the interview room with his mother. Minx and Winter entered the room, and Minx advised defendant and his mother that he had just turned the recording equipment on. Defendant indicated that he wished to speak to Minx. Minx reread defendant his *Miranda* rights, and defendant and his mother indicated they understood. Defendant then told the officers that Zach and A.S. had robbed the victim. Minx stated he did not want to talk to defendant anymore because his story was "complete B.S." Minx stated he would talk to defendant when he was ready to tell the truth, and he and Winter left the room.

¶ 15      Defendant and his mother remained in the room. Defendant stated: "They always f*** do that s***." He then stated: "I already know their games." Defendant's mother repeatedly told defendant that "we own up to our s***." She stated: "We don't put it on nobody who ain't got it coming." She then told defendant he had the right to remain silent and advised him not to say anything else until she got him a lawyer. She left the interview room.

¶ 16      Defendant's mother reentered the interview room approximately one minute later. She was angry and crying. She stated: "You tell me. You tell me you not that monster that man just showed me a picture of." Minx stood in the doorway for a few seconds and then closed it. Defendant's mother stated: "He showed me those pictures. You tell me now. You tell me now, [defendant]." Defendant replied, "Tell you what, mom?" Defendant's mother replied: "You tell me right now the truth. You tell me now." She stated: "I will only think of you less if you do not man up to this. You did that? Did you do that?" Defendant said something softly. His mother then stated: "Oh my god. Oh my god." She cried. Minx entered the room and asked them if they wanted "more privacy." Defendant's mother replied, "No. He's ready to make his statement."

¶ 17      Minx and Winter sat down. Defendant stated that he and A.S. "did it." Defendant stated that he and A.S. wanted money, and A.S. suggested robbing Eyman's trailer because he believed old men keep a lot of money. They entered the trailer and waited until Eyman returned. Defendant initially stated that he held Eyman down while A.S. stabbed him, but he admitted that he cut Eyman's face after Minx told him his story was not consistent with Eyman's statement. Defendant stated they took $20 from Eyman, and they also took his phone so he could not call the police. Defendant described the locations of the knives they had used and the gloves and clothing they had worn.

¶ 18      Defendant's mother testified that, on the day of the interview, police officers

called her and told her that defendant had been arrested for stealing shoes. She stated she had recently had surgery and told them they could question him without her present. Several hours later, Minx called her and told her they needed to have her come to the police station. Two officers came to her residence and asked her to come to the police station, telling her "things just got serious."

¶ 19 When defendant's mother arrived at the police station, she asked to speak to defendant without the conversation being recorded, and the officers agreed. When she went into the interview room, she told defendant that if he " [did] something [he] had no business doing," he needed to "own[ ] to that." Defendant told her he did not do it. Defendant's mother testified that she "looked at him dead in his face, and [her] gut said he didn't, so [she] got up, left the room." She then told an officer they would be getting a lawyer. While she was in the hallway, an officer showed her pictures of the victim. She stated: "The images got me to the point of physical sickness, emotionally out of control. I couldn't control my emotions." She walked back into the interview room and asked defendant again if he did it. She stated she "browbeat" defendant. Defendant stated he did not do it, and she continued to "browbeat" him. She stated she just wanted him to tell the truth.

¶ 20 Defendant's mother testified that on past occasions, when officers were interviewing defendant, they brought her in to try to elicit information from him. She stated they knew that if she talked to him, he would give them more information.

¶ 21 The prosecutor asked defendant's mother if there was a time she believed defendant was capable of committing the stabbing. She replied: "By his manic state, and I've seen him in his manic state, there was a high possibility on that." The prosecutor asked if she had been afraid of defendant "not too long before this," and she said yes. The prosecutor asked if

there was a point when defendant was in a "mental facility" and she did not want him to come home because she was afraid of him. She stated that she was not scared of defendant, but she was "just afraid of what he would to do himself or to [her] daughter or [her]."

¶ 22     On September 17, 2015, the trial court entered a written order denying the motion to suppress. The court found that defendant's mother was not acting as an agent of the State and did not coerce defendant into confessing to the charges against him.

¶ 23                                    B. Trial

¶ 24     The matter proceeded to a bench trial. The trial evidence showed that police officers conducted a wellness check on Eyman (who was 80 years old at the time of the trial) on the morning of November 22, 2014, after receiving a call from one of his neighbors. An officer found Eyman on the floor of his trailer with slash marks on his face and blood all over the floor. Eyman told police officers that a Black male and a White male were waiting for him when he got home the night before, and the Black male cut him in the face with a box cutter and stabbed him several times. According to Eyman, the two males took $30 from him, took his phone, and left. Eyman stated he was too weak after the attack to leave his home. An emergency room doctor who treated Eyman at the hospital that day testified that Eyman was in critical condition when he arrived and had potentially mortal stab wounds to the face and neck. The doctor estimated Eyman received 150 to 200 sutures.

¶ 25     That same day, officers were dispatched to a residence after receiving a report that the occupants had found unusual items under their porch. Officers found two pairs of bloody gloves, one of which had a phone inside of it. One pair of gloves was red, and the other had gray and white stripes. It was later determined that the phone belonged to Eyman. The gloves were sent for forensic testing. Both pairs of gloves tested positive for the presence of blood, and DNA

testing revealed a profile matching Eyman's on both pairs of gloves. The red gloves contained DNA matching defendant's DNA profile.

¶ 26        Detective Minx testified that he investigated Eyman's stabbing and developed defendant and A.S. as possible suspects. He testified about his two interviews with defendant at the police station. Defense counsel objected to any questions about defendant's statements during the interviews, though he acknowledged the trial court had already ruled on the issue. The court noted defense counsel's standing objection and later admitted into evidence a recording of defendant's second interview "[s]ubject to [defense counsel's] prior objections." Minx testified that officers later located a utility knife and a pocket knife at the location defendant described during his confession. Minx stated defendant took officers to the dumpster where he had discarded the clothing he wore during the incident, and they were able to recover the clothing.

¶ 27        A.S. testified that he was 16 years old and was currently in the custody of the Illinois Department of Juvenile Justice for burglary. He stated he had also been charged with the same offenses as defendant, and the State had agreed to try him as a juvenile in exchange for his testimony. A.S. stated that on the night of the incident, he and defendant entered Eyman's trailer and searched through Eyman's things, looking for money. They were both armed with knives. Eyman walked into the trailer, and defendant started stabbing him in the face. Defendant eventually stopped, and A.S. took a money clip from Eyman's pocket. They also took Eyman's cell phone so he would not be able to call the police, and they left.

¶ 28        A.S. acknowledged that he sent defendant a Facebook message saying, "Oh yeah that old guy ova with." When asked what this meant, A.S. indicated he believed the victim had died. Defendant responded, "I swear." Defendant then sent A.S. a message telling him to delete their messages "about all this." A.S. stated he did not delete any messages.

¶ 29      Defendant testified that he was at home on the night of the incident and had never been to Eyman's residence. He stated that A.S. was his friend. The day after the incident, A.S. told defendant he had robbed an old man, but defendant thought he was joking. Defendant stated he felt pressure to say that he was involved in the incident after talking to his mother because she was a "big influence" on him, and he "felt like [he] had to say something [he] didn't mean." He stated he had not actually been involved, and he had learned the information he gave the police from A.S. and others in the community. Defendant stated that the red gloves the police had found belonged to A.S., though defendant had worn them before. Defendant stated he knew where the gloves and clothing were because people he was around told him where they were located.

¶ 30      After the parties rested, the trial court dismissed one of the two counts of attempted murder on the State's motion. The court found defendant guilty of the remaining charges. The court noted that a motion to suppress had been filed. The court found defendant's mother was not coercive and stated it would be "preposterous to come to the conclusion that she was so influential in [defendant's] life that he would admit to something he didn't do." The court found that several hours was "not a long time in the world of interrogations," and it noted defendant was not deprived of anything. The court found defendant's testimony that he learned about the details of the offense from people in the community to be "preposterous."

¶ 31      Defendant filed a motion for a new trial, arguing, *inter alia*, that the trial court erred by denying the motion to suppress. The court denied the motion.

¶ 32      The trial court imposed consecutive prison sentences of 10 years for attempted first degree murder, 6 years for home invasion, and 6 years for armed robbery. The court also sentenced defendant to four years' imprisonment for residential burglary, to be served concurrently with his armed robbery sentence. The court did not impose sentences for aggravated

battery or theft, finding them to be lesser included offenses.

¶ 33                                    C. Direct Appeal

¶ 34          On direct appeal, defendant argued that the trial court abused its discretion in sentencing him and that he was entitled to additional presentence incarceration credit. *People v. Davenport*, 2018 IL App (3d) 160421-U, ¶ 2. The appellate court found that defendant was entitled to additional presentence credit and remanded the matter for the entry of a new mittimus reflecting the additional credit. *Id.* ¶ 16. It otherwise affirmed defendant's convictions and sentences. *Id.* ¶ 18.

¶ 35                              D. Postconviction Proceedings

¶ 36          On March 22, 2019, defendant, *pro se*, filed a postconviction petition, asserting several claims. In August 2019, the trial court appointed counsel to represent defendant. In 2021, appointed postconviction counsel filed a motion to withdraw, which the court granted. Thereafter, private postconviction counsel entered an appearance on defendant's behalf.

¶ 37          On February 27, 2023, defendant, through counsel, filed an amended postconviction petition. (This document is titled "Petitioner's Memorandum of Law in Support of His Petition for Post-Conviction Relief." The document also stated that it was an "amended postconviction petition, which is meant to supersede all other prior filings." The parties characterize it as an amended postconviction petition, and we will refer to it as such.) The amended postconviction petition argued that defendant received ineffective assistance of trial counsel and appellate counsel. Relevant here, it asserted that trial counsel was ineffective for failing to seek suppression of defendant's confession on the basis that it was involuntary. The amended postconviction petition alleged that if trial counsel or, alternatively, appellate counsel had properly raised this issue, the suppression motion would have been granted.

¶ 38    On May 31, 2023, the State filed a motion to dismiss the amended postconviction petition.

¶ 39    On August 10, 2023, the trial court held a hearing on the State's motion to dismiss. After hearing arguments, the court granted the motion to dismiss as to the claim that defendant's confession was involuntary and requested that the parties submit additional authority concerning a separate issue raised in the amended petition. On June 4, 2025, the court entered an order granting the State's motion to dismiss in its entirety. This appeal followed.

¶ 40                                    II. ANALYSIS

¶ 41    On appeal, defendant argues that his amended postconviction petition made a substantial showing of a claim that his appellate counsel provided ineffective assistance for failing to raise the preserved issue that his motion to suppress should have been granted because his statements to the police were involuntary. Defendant argues that the record shows that his confession was the result of his will being overborne by his upset mother and was involuntary under the totality of the circumstances.

¶ 42    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2022)) "provides a method for an individual subject to a criminal sentence to challenge a conviction by alleging it was the result of a substantial denial of federal or state constitutional rights, or both." *People v. Cotto*, 2016 IL 119006, ¶ 26. There are three stages to postconviction proceedings under the Act. *Id.* At the first stage, the trial court independently reviews the postconviction petition and determines whether it is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2022). If the court does not dismiss the petition at first stage, it advances to the second stage. *Cotto*, 2016 IL 119006, ¶ 26. At the second stage, counsel may be appointed to assist an indigent defendant, and the State may answer the petition or file a motion to dismiss. *Id.*

¶ 27. The court must determine whether the petition and accompanying documentation make a substantial showing of a constitutional violation. *Id.* ¶ 28. If the petition fails to make such a showing, it may be dismissed. *Id.* If it makes the requisite showing, the petition advances to a third-stage evidentiary hearing. *Id.*

¶ 43 Here, the petition was dismissed at the second stage, and, accordingly, it was defendant's burden to make a substantial showing of a constitutional violation. *People v. Domagala*, 2013 IL 113688, ¶ 35. At this stage, all well-pleaded facts that are not positively rebutted by the trial record are taken as true. *Id.* "[T]he 'substantial showing' of a constitutional violation that must be made at the second stage [citation] is a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, *which if proven* at an evidentiary hearing, would entitle [the] petitioner to relief." (Emphasis in original.) *Id.* A second-stage dismissal is reviewed *de novo*. *People v. Sanders*, 2016 IL 118123, ¶ 31.

¶ 44 To establish a claim of ineffective assistance of appellate counsel, "a defendant must show both that appellate counsel's performance was deficient and that, but for counsel's errors, there is a reasonable probability that the appeal would have been successful." *People v. English*, 2013 IL 112890, ¶ 33. "Appellate counsel is not obligated to brief every conceivable issue on appeal, and it is not incompetence of counsel to refrain from raising issues which, in his or her judgment, are without merit, unless counsel's appraisal of the merits is patently wrong." *People v. Easley*, 192 Ill. 2d 307, 329 (2000). Where the underlying issues are not meritorious, a defendant suffers no prejudice from counsel's failure to raise them on appeal. *Id.*

¶ 45 The prohibition against the admission of an involuntary confession "is rooted in the self-incrimination clause of the fifth amendment (U.S. Const., amend. V) and the due process clause of the fourteenth amendment (U.S. Const., amend. XIV, § 1)." *People v. Salamon*, 2022

IL 125722, ¶ 76. Also, "to be admissible, a confession must be 'voluntary' in a State-law sense." *People v. Bernasco*, 138 Ill. 2d 349, 365 (1990). While a confession is not involuntary under the fifth and fourteenth amendments unless it is causally connected to coercive police conduct, "under Illinois law, a confession may be deemed involuntary in the absence of police misconduct, based entirely on the defendant's personal characteristics." *People v. Westmorland*, 372 Ill. App. 3d 868, 876 (2007).

¶ 46　　　　The voluntariness of a confession depends on the totality of the circumstances of the case, and no single factor is dispositive in making such a determination. *Salamon*, 2022 IL 125722, ¶ 81. Relevant factors in determining the voluntariness of a confession include "the defendant's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning." *Id.* ¶ 81. Courts also consider the "legality and duration of the detention, the duration of the questioning, the provision of *Miranda* warnings, and any physical or mental abuse by police, including the existence of threats or promises." *Id.* In cases involving juveniles, courts also consider whether the juvenile had the opportunity to consult with an adult interested in his or her welfare. *In re G.O.*, 191 Ill. 2d 37, 55 (2000). This is because taking a juvenile's confession is "a sensitive concern," and "the greatest care must be taken to assure that the confession was not coerced or suggested and that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." (Internal quotation marks omitted.) *Id.* at 54.

¶ 47　　　　A confession may be used against a defendant where it is "the product of an essentially free and unconstrained choice by its maker." (Internal quotation marks omitted.) *Salamon*, 2022 IL 125722, ¶ 80. "However, if the will of the defendant has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due

process." (Internal quotation marks omitted.) *Id.*

"The test for voluntariness is not whether the accused wanted to confess or would have confessed in the absence of interrogation. Suspects typically do not confess to the police purely of their own accord, without any questioning. [Citation.] Rather, the test of voluntariness is whether the defendant made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he or she confessed." *People v. Gilliam*, 172 Ill. 2d 484, 500 (1996).

¶ 48 We turn to defendant's argument that the trial court erred by dismissing his amended postconviction petition at the second stage of proceedings because he made a substantial showing of a claim that his counsel on direct appeal provided ineffective assistance by failing to raise the preserved issue that under the totality of the circumstances, his confession was involuntary. Defendant argues that his age, intellect and education, mental health history, and substance abuse history weigh in favor of finding his confession involuntary. He also argues that the totality of the circumstances show that he was induced to confess when his mother "browbeat" him and contends that the police specifically used her for that purpose.

¶ 49 The State takes issue with the scope of defendant's argument, contending that defendant's "assertion that the voluntariness issue was preserved for direct appeal would have necessarily confined appellate counsel's arguments to those raised in the trial court." The State asserts that defendant's trial counsel did not proceed on a theory that his statements were involuntary due to his age, intellect and education, physical and mental health, or history of substance abuse. The State also argues that in his brief, defendant improperly relies on evidence not presented at the suppression hearing, including heavily relying on information in the

- 14 -

presence investigation report (PSI).

¶ 50          We find that defendant's claim that under the totality of the circumstances, his confession should have been suppressed on the basis that it was involuntary was preserved for direct appeal. See *Salamon*, 2022 IL 125722, ¶¶ 56-59. Defendant asserted in his motion to suppress that his " 'admissions' were not made voluntarily, were coerced, and were not a product of [his] free will and were false." Defense counsel made no argument at the suppression hearing concerning his precise theory of involuntariness. Defendant renewed his objection to the admission of his confession at trial and asserted in his posttrial motion that the trial court erred by denying his motion to suppress.

¶ 51          We disagree with the State that, had appellate counsel argued that the trial court erred by denying defendant's motion to suppress, appellate counsel could have only supported this argument with the evidence introduced at the suppression hearing. Here, defendant renewed his objection to the admission of his confession at trial based on his prior motion to suppress. The court addressed the suppression issue and the circumstances surrounding the confession when issuing its finding of guilt after the trial. Accordingly, appellate counsel could have relied on the evidence presented at trial in addition to the evidence at the suppression hearing. See *People v. Mendez*, 322 Ill. App. 3d 103, 112 (2001) ("When counsel renews the motion to suppress at trial, a reviewing court may consider the testimony and evidence presented at the pretrial suppression hearing and the testimony and evidence presented at trial."); see also *People v. Ramos*, 339 Ill. App. 3d 891, 898 (2003); *People v. Centeno*, 333 Ill. App. 3d 604, 620 (2002).

¶ 52          However, we agree with the State that defendant's reliance on information in the PSI in support of his ineffective assistance of appellate counsel argument is improper. Defendant fails to explain how sentencing evidence could be used on direct appeal to call into question a

trial court's ruling on a motion to suppress. Defendant cites no case in which sentencing evidence has been used in such a manner, and we doubt the propriety of considering evidence beyond the trial (when the motion to suppress is renewed at trial) when addressing on direct appeal whether the court erred by denying a motion to suppress.

¶ 53            In any event, defendant never sought reconsideration of the ruling on the motion to suppress in the trial court based on the evidence contained in the PSI, and, accordingly, he has forfeited such an argument for purpose of direct appeal. See *People v. Brooks*, 187 Ill. 2d 91, 128 (1999). Moreover, defendant fails to establish that the PSI would have been competent evidence in support of reversing the court's ruling on the motion to suppress. While the information in a PSI may be considered *at sentencing* to the extent the court finds the information therein to be relevant and reliable (*People v. Powell*, 199 Ill. App. 3d 291, 294 (1990)), "[t]he ordinary rules of evidence governing a trial are relaxed at the sentencing hearing" (*People v. Williams*, 2018 IL App (4th) 150759, ¶ 17). "Information contained in a [PSI] must necessarily consist in part of hearsay and other normally inadmissible evidence." *People v. Blanck*, 263 Ill. App. 3d 224, 234 (1994).

¶ 54            Notably, in this appeal, defendant argues only that he made a substantial showing of a claim that *appellate* counsel was ineffective for failing to raise the preserved issue that his confession should have been suppressed on the basis that it was involuntary. He does not argue that trial counsel was ineffective for failing to present additional evidence concerning his background in support of the motion to suppress. Accordingly, we conclude defendant's reliance on the PSI in support of his argument is improper, and we decline to consider the portions of his argument relying on evidence not introduced at the trial or suppression hearing.

¶ 55            We now consider whether, based only on the evidence presented at the

suppression hearing and at trial, defendant has made a substantial showing of a claim that appellate counsel was ineffective for failing to argue that the trial court erred by denying his motion to suppress his confession on the basis that it was involuntary. We find that he has failed to make such a showing because a reasonable probability does not exist that the result of defendant's direct appeal would have been different if counsel had raised this issue.

¶ 56       Though not cited by the parties, we find the decision in *People v. Robinson*, 273 Ill. App. 3d 1069, 1072 (1995), to be instructive. In *Robinson*, the court found the totality of the circumstances showed the 16-year-old defendant's confession was voluntary, where it occurred at the defendant's residence in the presence of detectives and his mother; the defendant was advised of his *Miranda* rights; the defendant had completed one year of high school and had no difficulty understanding the officers; the detectives did not abuse or threaten the defendant and made no promises to him; and the defendant's mother told him to tell the truth. *Id.* The court rejected the defendant's argument that his confession was involuntary because his mother, acting in cooperation with the police, induced him to tell the truth. *Id.* The court noted that the police did not ask the defendant's mother to get him to confess, instruct her to direct him to answer their questions, make her promises, or threaten her with arrest. *Id.* The court also noted that the defendant's mother expressed genuine concern for his welfare, and there was no evidence that the defendant objected to his mother's presence or asked that an attorney or disinterested advisor other than his mother be present. *Id.* at 1072-73.

¶ 57       Here, similar to *Robinson*, there was no evidence that any law enforcement officer asked defendant's mother to try to extract a confession from defendant or that she was otherwise working on behalf of law enforcement when she "browbeat" defendant or told the officers that defendant was ready to make his statement. We reject defendant's argument that the evidence at

the suppression hearing shows otherwise because, according to defendant, there was no reason for Minx to show his mother a photograph of the victim other than to try to get her to react and extract a confession from defendant. Minx's explanation as to why he asked defendant's mother if she wanted to see a picture of the victim—*i.e.*, to convey to her the gravity of the situation—was reasonable, and it was not necessarily foreseeable that she would react to the photograph in the way that she did.

¶ 58      The other circumstances of the interrogations weigh in favor of finding that defendant's statement was voluntary and that his will was not overborne. The record shows that defendant was 17 years old at the time of the interrogation, which was "on the older end of the juvenile scale." *People v. Murdock*, 2012 IL 112362, ¶ 44. He had been questioned by the police on prior occasions and did not appear to be particularly intimidated by the officers. When Minx accused defendant of lying and left the room during the second interview, defendant told his mother that the police "always f*** do that s***" and that he "already [knew] their games." The evidence showed defendant had been given *Miranda* warnings twice prior to his confession. While defendant had been in police custody for several hours at the time of his confession, his two interrogations totaled less than one hour. Minx testified that he had not threatened or coerced defendant or made promises of leniency in an attempt to extract a confession. Also, defendant had the opportunity to consult with his mother prior to making his confession.

¶ 59      While defendant relies heavily on information concerning his mental health history, intellect, and education in the PSI in arguing that his confession was involuntary, little evidence about these matters was actually presented at the suppression hearing and trial. During his first interview, defendant indicated he had been recently released from a "mental institute," where he had remained for approximately two weeks "for suicide." Similarly, during her

testimony at the suppression hearing, defendant's mother referenced defendant having manic and depressive states and having previously been in a "mental facility," but no other evidence concerning defendant's mental health was adduced at the suppression hearing or at trial. Accordingly, it was not established that defendant was suffering from a mental health condition at the time of the interrogation that could have affected the voluntariness of his confession. The parties presented no evidence at the suppression hearing or trial concerning defendant's intellect and educational background. However, the recordings of the interviews showed that defendant understood the officers' questions and responded to them appropriately.

¶ 60       Though defendant's mother's emotional reaction to seeing a picture of the victim likely played a significant role in defendant's decision to confess, we find the evidence did not show that defendant's will was overborne at the time of his confession, that his choice to confess was not a free one, or that his confession was otherwise coerced. Thus, a reasonable probability does not exist that the result of defendant's direct appeal would have been different if appellate counsel had argued that defendant's confession was involuntary under the totality of the circumstances. Accordingly, we find the trial court did not err by dismissing the petition at the second stage of postconviction proceedings.

¶ 61                                III. CONCLUSION

¶ 62       For the reasons stated, we affirm the trial court's judgment.

¶ 63       Affirmed.

- 19 -